HOTEL EMPLOYERS ASSOCIATION
OF SAN FRANCISCO,
Plaintiff/Appellant,

v.

Anne M. GORSUCH,* as Administrator
of Environmental Protection Agency,
et al., Defendants/Appellees.

No. 80–4413.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 1982.

Decided Feb. 24, 1982.

J. C. Ladd, San Francisco, Cal., argued, for plaintiff/appellant; Jeffrey R. Williams, Steinhart, Falconer & Morgenstein, San Francisco, Cal., on brief.

William A. Barrett, Deputy City Atty., San Francisco, Cal., Thomas H. Pacheco, Washington, D.C., argued, for defendants/appellees; George Deukmejian, Atty. Gen., Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., on brief.

---

* Anne M. Gorsuch has been substituted for Douglas M. Costle as defendant-appellee in this appeal pursuant to Federal Rule of Appellate Procedure 43(c)(1).

Before TRASK, SNEED and TANG, Circuit Judges.

TANG, Circuit Judge:

Hotel Employers Association of San Francisco appeals a summary judgment award entered against it in an action brought to invalidate the Environmental Protection Agency's approval of a system of sewer service charges adopted by the City and County of San Francisco. Two principal issues are raised: (1) did the district court err in holding that the EPA Administrator and the EPA's agents were not "arbitrary and capricious" in approving the City sewer charge system? and (2) did the district court err in holding that the City charge system did not violate equal protection or due process guarantees under the federal and California constitutions? We find no error and therefore affirm.[1]

FACTS

The City and County of San Francisco ("the City") operates a combined sewer system, meaning that both sanitary sewage and surface runoff flow into the same water collection and treatment network. The treatment system's capacity is sometimes overwhelmed when it rains, resulting in discharges of raw sewage and surface runoff into the bay and ocean between 80 and 100 times per year.

Under an order from the California State Water Resources Control Board ("the State Board") to abate the discharges, the City is constructing a $1.5 billion water treatment project to reduce the number of direct discharges into the bay and ocean. Seventy-five percent of the project's construction cost is financed through a federal matching grant approved by the Environmental Protection Agency ("EPA"); the balance of the cost is funded by State grants and City sewer revenue bonds. The City pays for bond debt service and operation and maintenance expenses from revenue generated by sewer service charges.

As a condition of the federal construction grant, the City obtained the EPA's and the State Board's approval of its sewer charge scheme. See 33 U.S.C. § 1284(b)(1) (1977 Supp. I). The City's sewer service charge is levied according to the amount of incoming tap water delivered to each user. The charge is calculated on the assumption that ninety percent of all incoming tap water is returned to the sewer system; the fee is adjusted according to the strength of the discharge normally associated with different categories of users. The charge system does not allocate operation and maintenance expenses between wet weather flow and dry weather flow, nor does it make a separate assessment of costs based on surface run-off.

In December, 1978, the Hotel Employers Association of San Francisco ("HEA"), an association of 41 member hotels, brought this action in federal district court challenging the EPA's approval (through its delegated agent, the State Board) of the City's system of sewer service charges. HEA argued first that the sewer charge system failed to allocate treatment costs of surface runoff according to the acreage occupied by each user and therefore violated the proportionality requirement of section 204(b) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1284(b). HEA also challenged the adoption and approval of the charge system on federal and state due process and equal protection grounds.

On cross-motions for summary judgment, the district court granted summary judg-

---

1. The Hotel Employers Association also appeals the district court's denial of its motion for class certification of the members of the Association. As the Association's membership is identical to the membership of the class the Association sought to certify, and as we decide that summary judgment was appropriate against the Association's claims, the issue whether class certification was improperly denied is moot. We therefore do not consider the issue.

ment for EPA and the other defendants. The court ruled that the approval by EPA and its designated agent, the State Board, was not "arbitrary or capricious" and that a "rational basis" existed for their conclusion that City sewer charge system satisfied the proportionality requirements of section 204(b). The trial court also rejected HEA's constitutional claims, reasoning that if the EPA approval of the sewer charge system was not "arbitrary or capricious", the system also passed muster under the less exacting "rational relationship" standard associated with the constitutional claims. HEA appeals.

DISCUSSION

I. *Review of EPA Approval*

Under section 204(b)(1)(A) of the FWPCA, the EPA may approve a federal construction grant only upon a showing that "the applicant . . . has adopted or will adopt a system of charges to assure that each recipient of waste treatment services . . . will pay its *proportionate share* of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant." 33 U.S.C. § 1284(b)(1)(A) (1977 Supp. I) (emphasis added). Section 204(b)(2)(B) requires the EPA to issue guidelines for such user charges, including "criteria against which to determine the adequacy of charges imposed on classes and categories of users *reflecting all factors that influence the cost of water treatment* including strength, volume, and delivery flow rate characteristics of waste . . . ." 33 U.S.C. § 1284(b)(2)(B) (1977 Supp. I) (emphasis added).[2]

HEA interprets these two subsections to require grant applicants to apportion operation and maintenance costs in proportion to the burden each user places on the treatment system. While HEA concedes that the City charge system meets this requirement with respect to sanitary sewage, it contends that the charge system fails to apportion the cost of treating surface run-off on a proportionate basis. HEA estimates, and for summary judgment purposes the district court agreed, that surface run-off treatment costs account for thirty-five percent of the total operating and maintenance costs of the City's treatment system. The charge system allocates surface run-off treatment costs on a pro-rata user basis; each user's percentage share of total *run-off* treatment cost is the same as the percentage share each user contributes to the total cost of treating *only sanitary sewage.* According to HEA, however, this is erroneous; the amount of surface run-off attributable to a user's property depends upon the property's land area and not upon how much sewage the user loads into the treatment system. To meet the proportionality requirement of section 204(b), HEA contends that the charge system must apportion the costs of treating surface run-off according to the acreage occupied by each user.

As section 204(b) approval does not require a hearing or formal findings on a record, EPA's decision to approve the City's charge system is reviewed under the "arbitrary or capricious" standard of 5 U.S.C. § 706(2)(A) (1976). *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). Under this narrow standard, a reviewing court must determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Washington State Farm Bureau v. Marshall,* 625 F.2d 296, 302 (9th Cir. 1980). We must affirm the agency action if a reasonable basis existed for its decision. *Id.* at 302.

The district court sustained the EPA's approval under this standard because the

---

2. The regulations implementing this section are found at 40 C.F.R. §§ 35.929 to 35.929–3 (1980).

EPA could rationally conclude that: (1) the City's charge system satisfied the proportionality requirement of section 204(b), and (2) the City's charge system was consistent with regulations promulgated by EPA to implement section 204(b).

## A. *Consistency with the Statute*

Section 204(b)'s reference to "proportionate share" is nowhere defined in the FWPCA. The district court, however, found that the section's legislative history suggests that Congress did not intend to impose an "absolute proportionality" requirement and meant to require "only proportionality which is generally equitable". The court argued that proportionality, while a general requirement, was not a primary motivation for the enactment of the user fee requirement. According to the court, Congress instead was primarily concerned with ensuring that treatment systems would be self-financing and was tolerant of local variations in user charge schemes so long as this basic requirement was met. Thus, while the City charge system apportioned costs on a proportionate basis only with respect to sanitary sewage, the court concluded that the system was sufficiently sensitive to each user's burden on the total treatment system to satisfy the proportionality requirement.

HEA concedes that Congress desired to give localities flexibility in devising financing schemes, but argues that this broad concern should not obscure the command of the statute's text requiring proportionality. To bolster its point, HEA emphasizes that in 1974 Congress failed to adopt an EPA-proposed bill that would have specifically authorized localities to apportion surface run-off treatment costs on a pro-rata basis.[3] HEA reasons that had Congress intended to permit pro-rata allocation of these costs, it would have adopted this amendment.

We believe HEA is reading too much into this instance of Congressional inaction. The proposed bill's main focus was to permit localities to finance treatment costs through ad valorem taxes. This portion of the bill was ultimately enacted three years later without the language cited by HEA.[4] Although Congress may have refused to act on this part of the 1974 bill because it opposed the bill's intent, inaction might also have been due to the belief that the point was already covered by existing law. *See e.g., Diamond Crystal Salt Co. v. P. J. Ritter Co.*, 419 F.2d 147, 148 (1st Cir. 1969). The scant legislative history that exists concerning the 1974 bill supports this latter possibility. As noted by the district court, the letter submitted by then-EPA Administrator Russell Train in support of the 1974 bill reveals that EPA considered surface run-off treatment costs as not attributable to a user and thus not subject to the proportionality requirement under then-existing

---

**3.** The proposed bill provided:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that paragraph (1) of subsection (b) of section 204 of the Federal Water Pollution Control Act (86 Stat. 816; 33 U.S.C. 1251 *et seq.*) is amended—

(a) By striking the word "recipient" in subparagraph (A) and inserting in lieu thereof the following: "category or class of recipients;"

(b) By adding at the end of paragraph (1) the following:

The Administrator may approve a user charge system based upon ad valorem taxation if he determines that (A) a change from this method would be costly, disruptive and difficult, (B) the goal of proportionality among classes of recipients will be

substantially achieved, and (C) surcharges will assure that each industrial user will pay its proportionate share on the basis of volume, strength, and other relevant factors. *Indirect costs not identifiable with any individual user, such* as administrative costs, *treatment of storm sewer and combined sewer flows, correction of infiltration/inflow*, and services for exempt property shall be equitably prorated among all user classes.

(Emphasis added).

The highlighted portion is the language HEA finds significant.

**4.** The bill was enacted as part of section 22 of the Clean Water Act of 1977, Pub.L. 95–217, § 22(b), 91 Stat. 1566 (1977) (codified in 33 U.S.C. § 1284(b)(5) (1977 Supp. I)).

law.[5] Given that the bill's focus was elsewhere, it is likely that Congressional attention was never specifically drawn to the portion of the 1974 bill HEA cites.

HEA is correct, however, to the extent that nothing in section 204(b)'s legislative history supports the conclusion that Congress *specifically* authorized the method the City has employed to apportion surface run-off treatment costs. The legislative history underlying section 204(b) supports the district court's conclusions concerning the purpose of user's fees and the importance Congress placed upon giving localities flexibility in designing user fee systems.[6] Unfortunately, nothing in the various committee reports or floor debates speaks directly to how Congress wished surface run-off treatment costs to be apportioned. Congress appears to have enacted the proportionality requirement with *sewage* treatment squarely in mind, but it appears that it never directly confronted how it desired localities to finance the treatment of *surface run-off*.

■ The legislative history's emphasis upon local flexibility, however, persuades us against narrowly interpreting section 204(b)(1) to require localities to apportion treatment costs with exacting mathematical precision. Although HEA is correct in arguing that no logical connection exists between a landowner's sewage loading and how much rainfall runs off his or her property, basing the City charge system solely upon sewage loading achieves at least rough proportionality because the preponderance of operating costs are attributable to sewage loading. The Congressional emphasis upon local flexibility suggests that section 204(b) requires no more.

■ Moreover, in contrast to a user loading sewage into a treatment system, surface run-off cannot be fairly ascribed to individual land-owners' "use" of the treatment system. Nature's whims and not land-owners' actions determine where and how much rainfall descends upon the City.

5. Out of the five page, single-spaced letter discussing the bill, only one paragraph mentions the language cited by HEA:

> The proposed bill would amend section 204(b)(1) of the Federal Water Pollution Control Act to permit construction grant applicants to utilize a user charge system based upon ad valorem taxation for funding operation and maintenance costs. More specifically, before approving such a system, the Administrator of the Environmental Protection Agency would have to determine that: (A) a change from this method would be costly, disruptive and difficult, (B) the goal of proportionality among classes of recipients will be substantially achieved, and (C) surcharges will assure that each industrial user will pay its proportionate share on the basis of volume, strength, and other relevant factors. *Indirect costs not identifiable with any individual user,* such as administrative costs, *treatment of storm sewer and combined sewer flows, correction of infiltration/inflow,* and services for exempt property shall be equitably prorated among all user classes.
>
> (Emphasis added).

6. The best evidence of this legislative intent is found in the Senate Report that recommended adoption of the user fee requirement. One portion of the report notes:

> Each system of user charges imposed pursuant to the requirements of the bill must be designed in such a way as to generate suffi-

cient revenues to operate and maintain the treatment works to which it applies ... The committee bill anticipates that the agencies responsible for constructing and operating treatment works will, through the imposition of user charges, become *financially self-sufficient* with respect to the operation and maintenance (including replacement as defined) of treatment works constructed with assistance pursuant to the Act.

Although the committee is aware of the many different legal and financial circumstances that characterize state and local governments and agencies throughout the country, the bill directs the Administrator to promulgate guidelines for the establishment and imposition of user charge systems as a guide to grant applicants for waste treatment works grants. These guidelines should take into account the diversity of legal and financial factors that exist from jurisdiction to jurisdiction, and *each applicant should be permitted reasonable flexibility in the design of a system of user charges that meets the unique requirements of his own jurisdiction.* As a *general* rule, the volume and character of each discharge into a publicly owned system should form the basis of determining the rate at which each user should be required to pay.

S.Rep.No. 92–414, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 3668, 3695 (emphasis added).

It therefore would not be irrational for the EPA Administrator to conclude that surface run-off is not attributable to any individual property owner.

In sum, we conclude that the district court was correct in concluding that the EPA Administrator had a "rational basis" for concluding that the City's charge system conformed with section 204(b)'s proportionality requirement.

### B. *Consistency with EPA Regulations.*

■ In 1978, the EPA promulgated a regulation describing how user charge systems should apportion treatment costs of surface run-off. It provides:

> (d) *Charges for operation and maintenance for extraneous flows.* The user charge system shall provide that the costs of operation and maintenance for all flow not directly attributable to users (i.e., infiltration/inflow) be distributed among all users of the grantee's treatment works system based upon either of the following:
>
> (1) In the same manner that it distributes the costs of operation and maintenance among users (or user classes) for their actual use, or
>
> (2) Under a system which uses one of any combination of the following factors on a reasonable basis:
>
> (i) Flow volume of the users;
>
> (ii) Land area of the users;
>
> (iii) Number of hookups or discharges to the users;
>
> (iv) Property valuation of the users, if the grantee has a user charge system based on ad valorem taxes approved under § 35.929–1(b).

40 C.F.R. § 929–2(d) (1980).

The district court ruled that the City's charge system was consistent with subsection 2(d)(1) because surface run-off treatment costs are allocated using the same formula used to apportion sewage treatment costs. HEA argues that subsection 2(d)(1) does not apply because the City's charge system apportions sewage treatment costs according to the added treatment burden attributable to each user and does not follow this general approach in apportioning the costs of treating surface run-off. This argument, however, ignores the regulation's first clause, which indicates that EPA does not consider "inflow" such as surface run-off [7] to be "directly attributable to users." A literal reading of subsection 2(d)(1) instead appears to endorse the City's method of allocating surface run-off costs according to the same formula used to apportion sewage costs.

HEA also argues that if the City's charge system is consistent with the regulation, the regulation is invalid because it violates FWPCA section 204(b)(1)'s proportionality requirement. We reject this argument because HEA has failed to demonstrate that the City's method of allocating surface run-off costs is inconsistent with the statutory proportionality requirement.

In sum, we conclude that the district court was correct in concluding that the EPA Administrator had a "rational basis" for concluding that the City's charge system conformed with 40 C.F.R. § 929–2(d)(1).

### II. *Constitutional Claims*

■ HEA argues that the equal protection and due process guarantees of the United States and California constitutions require governmental user charges to bear some rational relationship to the burden that individual users impose upon the public treatment system. It contends that the City's charge system violates this standard because it allocates the cost of treating surface run-off as a pro-rated share of a

---

**7.** The regulations include surface run-off within the definition of "inflow". 40 C.F.R. § 35.905 (1980).

user's sewage fee rather than allocating the costs by the acreage occupied by each user.[8]

We find no merit in this contention. HEA concedes that the alleged constitutional infirmity in the City charge system must be evaluated under the highly deferential "rational relationship" test. Thus, even if a proportionality requirement can be read into the federal and state constitutions, the charge system and the classifications it employs must be upheld unless shown to be "wholly arbitrary". *See, e.g., City of New Orleans v. Duke*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). This standard is less demanding than the statutory proportionality standard required under FWPCA section 204(b)(1). As we have determined that the City's charge system satisfies the statutory proportionality requirement, it follows that it also satisfies any due process or equal protection requirement.

AFFIRMED.

---

8. HEA argues that this constitutional defect invalidates the sewer charge system not only as a method of raising revenue for operating costs, but also as a method of financing debt service for the City sewer revenue bonds. The statutory proportionality requirement does not apply to bond debt service.