686 F.2d 120
 17 ERC 1937, 12 Envtl. L. Rep. 20,803,
11 Fed. R. Evid. Serv. 1139
 CITY OF NEW BRUNSWICK, Appellee,
v.
BOROUGH OF MILLTOWN and the Middlesex County Utilities
Authority (formerly Middlesex County Sewerage
Authority), Appellants.
and
The MIDDLESEX COUNTY UTILITIES AUTHORITY (formerly the
Middlesex County Sewerage Authority), Appellant,
v.
The UNITED STATES of America, By and Through its
ENVIRONMENTAL PROTECTION AGENCY, Appellee.
 No. 81-2906, 81-2907.
 United States Court of Appeals,
Third Circuit.
 Argued June 24, 1982.
Decided July 22, 1982.
 
 Milton B. Conford, Francis X. Journick, Woodbridge, N. J., of counsel; Wilentz, Goldman & Spitzer, P.C., Woodbridge, N. J., for appellant Middlesex County Utilities Authority.
 Arnold K. Mytelka, Roger S. Clapp, Clapp & Eisenberg, P.C., Newark, N. J., Robert S. Seguin, Booream & Seguin, Milltown, N. J., for appellant Borough of Milltown.
 Carol E. Dinkins, Asst. Atty. Gen., Donald W. Stever, Jr., Edward J. Shawaker, Rosanne Mayer, Dept. of Justice, Washington, D. C., Robert M. Perry, Gen. Counsel, Lee DeHihns, E. P. A., Washington, D. C., for appellee E. P. A.
 James M. Cahill, Asst. City Atty., New Brunswick, N. J., for appellee City of New Brunswick.
 Before GARTH and BECKER, Circuit Judges, and FULLAM*, District Judge.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 In this appeal we are presented with two questions. The first is whether the Environmental Protection Agency ("EPA") acted within its authority in withholding federal grant funds from the Middlesex County Utilities Authority ("MCUA") on the ground that the Borough of Milltown, whose sewage is treated by the MCUA's plant at Sayreville, New Jersey, has not adopted a system of user charges as required by the Federal Water Pollution Control Act Amendments of 1972, as amended, 33 U.S.C. §§ 1251 et seq. ("the Clean Water Act"), and its implementing regulations, 40 C.F.R. §§ 35.900 et seq. The second issue is whether-assuming that the EPA's decision to withhold funds does fall within its authority-the Clean Water Act unconstitutionally impairs a contract which Milltown has with the neighboring City of New Brunswick, a participating member of the MCUA, under which New Brunswick is responsible for disposing of Milltown's sewage free of charge to Milltown. Because we agree with the district court's determination that the EPA is authorized to withhold funds from the MCUA in the circumstances of the present case, and that the provisions of the Clean Water Act authorizing such withholding are not inconsistent with the constitutional provisions regarding impairment of contracts, we will affirm the district court's judgment.
 
 I.
 
 2
 The present dispute stems from a decision by the MCUA to apply to the EPA for federal funds to assist it in the expansion and improvement of a sewage treatment facility that the MCUA operates. This plant, located in Sayreville, New Jersey, receives sewage from approximately twenty-five municipalities in three New Jersey counties, as well as from a number of industrial concerns. Currently, the MCUA is engaged in a construction project to install new lines and make other improvements which will allow the Sayreville plant to operate with less of an adverse impact on water quality.
 
 
 3
 To help defray the cost of these improvements, the MCUA applied to the EPA for federal grant funds pursuant to the Clean Water Act.[1] Title II of that Act, 33 U.S.C. §§ 1281-1297, establishes a federal grant program under which the federal government will bear up to 75 percent of the construction cost of publicly-owned waste treatment plants, so long as certain conditions are met by the grantee. See generally Bosco v. Beck, 475 F.Supp. 1029, 1031 (D.N.J.1979), aff'd without opinion, 614 F.2d 769 (3d Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980). On August 30, 1976, the EPA approved the MCUA's application, on the condition, among others, that the MCUA comply with the "user charge" provisions of the Clean Water Act.
 
 
 4
 Under the user charge provisions of the Act, the EPA administrator is not to approve a grant
 
 
 5
 unless he shall first have determined that the applicant (A) has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, will pay its proportionate share (except as otherwise provided in this paragraph) of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant * * *.
 
 
 6
 33 U.S.C. § 1284(b)(1) (Supp.1982) (hereinafter referred to as "section 204(b) (1)"). The EPA regulations specify what requirements a user charge system must meet in order to satisfy section 204(b)(1). In general, the user charge system proposed by a grantee such as the MCUA must, in order to meet approval, ensure that "each user ... pays its proportionate share of operation and maintenance (including replacement) costs of treatment works within the grantee's service area, based on the user's proportionate contribution to the total waste water loading from all users ...." 40 C.F.R. § 35.929-1(a).[2] Moreover, in the case of a "regional treatment system accepting wastewaters from other municipalities," such as the MCUA, "the subscribers receiving waste treatment services from the grantee shall adopt user charge systems in accordance with section 204(b)(1)(A) of the Act (quoted above) and §§ 35.929 through 35.929-3" of the regulations. Id. § 35.929-2(e).
 
 
 7
 After making some payments to the MCUA pursuant to the grant agreement of August 30, 1976, the EPA determined that the MCUA was not complying fully with section 204(b)(1) of the Clean Water Act, or with the implementing regulations, as required by the terms of the grant agreement. The basis for this determination was the fact that the Borough of Milltown, whose sewage is treated by the MCUA at the Sayreville plant, has not adopted a user charge system.[3] The explanation for Milltown's failure to adopt such a system is a contract that Milltown signed in 1914 with the City of New Brunswick, which, unlike Milltown, is a participating member of the MCUA and so pays the MCUA for sewage treatment. As the district court noted, it is undisputed that
 
 
 8
 in 1914 the City of New Brunswick entered into a contract with the Borough of Milltown under which New Brunswick agreed to receive and dispose of Milltown's sewage without charge in exchange for Milltown's promise to discontinue its practice of discharging sewage into the Lawrence Brook, a source of drinking water for New Brunswick. On two separate occasions, New Jersey courts have upheld the validity of this contract. City of New Brunswick v. Borough of Milltown, 3 N.J.Super. 113, 65 A.2d 621 (App.Div.1949); City of New Brunswick v. Borough of Milltown, 135 N.J.Eq. 310, 38 A.2d 288 (Ch. 1944).
 
 
 9
 As a result of this contract, the sewage from Milltown flows free of charge from Milltown to New Brunswick, and the combined flows from the two municipalities are treated at the MCUA plant. New Brunswick pays MCUA for its own and for Milltown's sewage at a rate set by the MCUA. Milltown pays nothing to New Brunswick or to MCUA and has not, to date, adopted a system of sewer user charges to pay for its proportionate share of waste treatment.
 
 
 10
 City of New Brunswick v. Borough of Milltown, 519 F.Supp. 878, 881 (D.N.J.1981).
 
 
 11
 As a consequence of its determination that the MCUA was not in full compliance with the user charge requirement because Milltown, "a recipient of waste treatment services within the (MCUA's) jurisdiction," had not adopted a user charge system, the EPA began to withhold funds for the Sayreville project.[4] It is that determination which is attacked by Milltown and the MCUA in the present case.
 
 
 12
 The legal challenge to the EPA's decision to withhold funds for the Sayreville project was brought into federal district court by a rather involved sequence of procedures and actions:
 
 
 13
 (I)n August, 1980 ... the City of New Brunswick instituted suit in the Superior Court of New Jersey, Chancery Division, Middlesex County, against Milltown and the MCUA, seeking an injunction and declaration that a 1914 contract between itself and Milltown, which obligates New Brunswick to receive and dispose of Milltown's sewage without cost, was void on several grounds, including allegations based on EPA regulations:
 
 
 14
 Federal Rules and Regulations governing the Middlesex County Sewerage Authority must be made applicable to all users of the system, including the Defendant, Borough of Milltown, regardless of whether or not the user has a direct contract with the Sewerage Authority.
 
 
 15
 Complaint, P 4, Third Count.
 
 New Brunswick further alleged:
 
 16
 (U)nder such Rules and Regulations such users of the Sewerage Authority's facilities must pay their fair share of the cost of operating and maintaining the Sewerage Authority's treatment works.
 
 
 17
 Complaint, P 5, Third Count.
 
 
 18
 In November, 1980, MCUA brought the Environmental Protection Agency into the state court litigation by naming it as a third-party defendant. In its cross-complaint, MCUA alleged that neither the Clean Water Act nor its implementing regulations requires that Milltown adopt a system of user charges and that, even if they did, such a requirement would constitute an unconstitutional abrogation of the 1914 contract. EPA removed this action to the Federal District Court under 28 U.S.C. § 1442(a)(1) in December, 1980, and ... answered and counterclaimed against all other parties, seeking a declaration that section 204 authorizes EPA to withhold grant funds from MCUA pending adoption of the user charges by Milltown and an injunction requiring Milltown to adopt such user charges or alternatively, to cease sending its sewage through MCUA's facility for treatment.
 
 
 19
 City of New Brunswick v. Borough of Milltown, 519 F.Supp. at 880-81 (footnote omitted).
 
 
 20
 All parties then moved for partial summary judgment on the federal issues presented by the litigation. In an order of September 9, 1981, the district court essentially ruled in favor of the EPA on the federal questions. In its accompanying opinion of August 11, 1981, the district court first held that under section 204(b)(1) Milltown is a "recipient" of waste treatment services from the MCUA. According "great deference" to the EPA's interpretation of the Clean Water Act, the district court held that "(t)he fact that Milltown itself does not directly place its own waste into the MCUA system or require that waste water be treated by the MCUA is not material"; Milltown's sewage is in fact treated by the MCUA, and so Milltown is a "recipient" of the MCUA's services. 519 F.Supp. at 882.
 
 
 21
 Such an interpretation of the statute, the district court reasoned, would fulfill what it found to be the twofold purpose of the user charge requirement of the Clean Water Act. By requiring that every recipient of waste treatment services pay its proportionate share of the treatment costs, section 204(b)(1) ensures that every facility built with federal financial assistance will be economically self-sufficient in its operations; moreover, the imposition of user charges provides an incentive to discourage excessive use of the sewage treatment system. In the present case, the district court held, the EPA's determination that adoption of a user charge system by Milltown should be a prerequisite to continued funding of the Sayreville improvements is consistent with those purposes:
 
 
 22
 Unless Milltown adopts its own system of user charges there is simply no incentive on individual or industrial users within Milltown to decrease their water consumption and thereby decrease discharges in the MCUA facility. Moreover, should New Brunswick break its contract with Milltown and cease paying for the costs of treating Milltown's wastes, MCUA would, in the absence of a user charge system in Milltown, be faced with a revenue shortfall.
 
 
 23
 519 F.Supp. at 883.
 
 
 24
 Having held that the EPA's withholding of funds falls within the scope of the statute and the regulations, the district court turned to the question whether "the (Clean Water) Act so interpreted unlawfully impairs Milltown's contract with New Brunswick or is otherwise invalid or contrary to public policy." 519 F.Supp. at 883.[5] Reasoning that "the (federal) government does have the right to impair existing contractual obligations if the contemplated action is reasonably necessary to further a legitimate public purpose," the district court held that Congress has a legitimate interest in protecting the quality of the environment, and that the means chosen to further that end-the conditioning of federal grant money on compliance with terms designed to promote the improvement of the environment-were reasonably related to that end. This was so, the district court held, especially considering that the Clean Water Act is not an "automatic abrogation of all contracts involving charges for sewage treatment." Id. at 884. See also United States Trust Co. v. New Jersey, 431 U.S. 1, 31, 97 S.Ct. 1505, 1522, 52 L.Ed.2d 92 (1977). As far as the "public policy" objections to the EPA's withholding of funds are concerned, the district court rejected the argument that MCUA is being "punished" for something beyond its control:[6] "MCUA is under no obligation to apply for grant funds from EPA." Id.[7]
 
 
 25
 Finally, having granted judgment in favor of the EPA and New Brunswick on the federal claims, the district court held that the remaining issues should be resolved by the state courts. Thus, rather than order Milltown either to adopt a user charge system or to cease sending its sewage to the MCUA's plant (as the EPA and New Brunswick had requested the court to do), the district court remanded the case to the state courts for determination of whether, in light of the "dramatic change in circumstances" occasioned by the passage of the Clean Water Act, the Milltown-New Brunswick contract still has binding force. Id. at 886.[8] Both the MCUA and Milltown then filed timely notices of appeal.
 
 II.
 
 26
 In considering the arguments of Milltown and the MCUA that the EPA's decision to withhold funds is unauthorized by the Clean Water Act, we are guided by the Supreme Court's repeated admonitions that "when faced with a problem of statutory construction," the courts should show "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed. 616 (1965); see EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 83-84, 101 S.Ct. 295, 66 L.Ed.2d 268 (1981). Thus, so long as the interpretation of the Clean Water Act propounded by the EPA "is reasonable and is consistent with the language and purpose of the legislation," Chrysler Corp. v. EPA, 631 F.2d 865, 884 (D.C.Cir.), cert. denied, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980), we will defer to that interpretation. See American Iron and Steel Institute v. EPA, 526 F.2d 1027, 1041 (3d Cir. 1975), modified on other grounds, 560 F.2d 589 (3d Cir. 1977), cert. denied, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). In the present case, we agree with the district court that Milltown and the MCUA have failed to produce the "weighty reasons," Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 117, 74 L.Ed. 457 (1930), that would be needed to persuade us to set aside the EPA's interpretation of the Clean Water Act.
 
 A.
 
 27
 Appellants' first contention is that the language of the Clean Water Act and the implementing regulations do not support the EPA's position that funds can be withheld from the MCUA based on Milltown's failure to adopt a user charge system. In support of this contention, appellants offer three arguments. First, Milltown argues that it cannot be deemed to be a "recipient" of the MCUA's waste treatment services within the meaning of section 204(b)(1). "Once the sewage crosses into New Brunswick," Milltown argues, "the sewage belongs to New Brunswick," not Milltown; thus it is New Brunswick, not Milltown, that "receives" services from the MCUA. See Brief of Milltown at 11-12. We think, however, that the district court was entirely correct in rejecting this argument: sewage generated in Milltown is in fact treated at the MCUA's Sayreville plant, and therefore the EPA'S position is in no way inconsistent with the language of the statute in considering Milltown a "recipient," albeit an indirect one, of the MCUA's treatment services.
 
 
 28
 Second, both the MCUA and Milltown argue that even if Milltown can in this general sense be deemed a "recipient" of the MCUA's waste treatment services, section 204(b)(1) contains a plain and explicit limitation on the scope of the term "recipient": only those recipients who are "within the applicant's (MCUA's) jurisdiction" can be required to adopt a user charge system.[9] Milltown, the appellants argue, is not within the MCUA's "jurisdiction," for under state law the MCUA has no legal power to direct Milltown to do anything.[10] The EPA replies that the phrase "within the applicant's jurisdiction" does not refer to legal power, but rather simply means "within the territory served by the sewage treatment plant." See 40 C.F.R. § 35.929-1(a) (referring to users "within the grantee's service area"). The territory served by the Sayreville plant, of course, includes Milltown.
 
 
 29
 Like the term "recipient," the word "jurisdiction" is not defined in the statute. Nor, in our view, is there any clear legislative history indicating precisely what the phrase "within the applicant's jurisdiction" was intended to mean.[11] The EPA's interpretation, however, is certainly a plausible one; and considering that section 204(b)(1) speaks of the "applicant's jurisdiction, as determined by the Administrator," we will not set aside the agency's interpretation simply because appellants offer another plausible interpretation. Cf. Chrysler Corp. v. EPA, 631 F.2d at 885 (refusing to set aside plausible and reasonable interpretation of Clean Air Act by EPA simply because party offers an alternative plausible interpretation).
 
 
 30
 Finally, Milltown argues that the language of the EPA's own regulations clearly indicates that the "EPA itself ... did not intend to override an agreement such as that between Milltown and New Brunswick." Brief of Milltown at 24. Milltown points to 40 C.F.R. § 35.929-2(g), which provides in part that "(t)he user charge system shall take precedence over any terms or conditions of agreements or contracts between the grantee and users ... which are inconsistent with the requirements of section 204(b)(1)(A) of the (Clean Water) Act and these regulations." This regulation, Milltown argues, "was only intended to supersede inconsistent contracts to which the grantee (here MCUA) is a party, not contracts (such as that between Milltown and New Brunswick) to which the grantee is not a party." Brief of Milltown at 24. We are not presented here, though, with a case in which the basis for a determination of a failure to comply with section 204's requirements is a "contract between a grantee and a user." Thus for the very reason that Milltown's interpretation of section 35.929-2(g) appears correct, that particular regulation is simply irrelevant to the present case: the EPA is not basing its withholding of funds on any contract between the MCUA and Milltown.
 
 
 31
 In attempting to counter Milltown's argument concerning the regulations, the EPA relies on 40 C.F.R. § 35.929-2(e), which provides:
 
 
 32
 If the project is a regional treatment system accepting wastewaters from other municipalities, the subscribers receiving waste treatment services from the grantee shall adopt user charge systems in accordance with section 204(b)(1)(A) of the Act and §§ 35.929 through 35.929-3. These user charge systems shall also be incorporated in appropriate municipal legislative enactments or other appropriate authority of all municipalities contributing wastes to the treatment works.
 
 
 33
 (Emphasis added.) It is possible that the underscored passage in this regulation was intended to require municipalities such as Milltown, whose sewage is treated by the grantee but who have no direct relationship with the grantee as a subscriber, to adopt user charge systems. On the other hand, it is also possible that the underscored passage simply refers to the implementation of a user charge system by the municipal subscribers to a regional waste treatment facility. Were the regulations more lucid, this section might well provide an alternative ground for our decision. Given its lack of clarity, however, our decision that Milltown is a recipient rests not on 40 C.F.R. § 35.929-2(e), but on the plain meaning of the statute, its intended goals, and the agency's interpretation of its mandate.[12]
 
 B.
 
 34
 Appellants' second contention concerning the proper interpretation of the Clean Water Act is that even if the statutory language itself does not compel adoption of their reading of the Act, an analysis of the purposes of the Act clearly indicates that Congress' intent was such that the MCUA's eligibility for grant funds should in no way be jeopardized by the fact that Milltown has not adopted a user charge system. More specifically, the MCUA argues that the Clean Water Act, interpreted in light of its purposes, does not give the EPA the authority to withhold funds from a grantee because a relatively insignificant user with no direct relationship to the grantee fails to adopt a user charge system, Brief of MCUA at 19-39, and, alternatively, that even if the statute does give the EPA such authority, the agency's exercise of that authority constitutes an abuse of discretion on the particular facts of this case, id. at 39-43. The MCUA advances the same arguments in support of its abuse of discretion claim as it does for its claims concerning the proper interpretation of the statute, however, and we will consider the two claims together.
 
 
 35
 According to appellants, a literal or strict reading of the Clean Water Act, by which every municipality whose sewage is treated by the MCUA is considered to be a "recipient" of its services and so obligated to institute a system of user charges as a condition of the Sayreville project grant, contravenes, or at the very least does nothing to further, three important policies embodied in the Clean Water Act. The first policy is the congressional determination that because the massive job of cleaning up the nation's waters cannot be completed without generous federal financial assistance, Clean Water Act grants should not be denied on the basis of trivial matters over which the grantee has no control. The second policy is that of flexibility in adapting the grant requirements to "allow for such special and local variations in the legal and financial circumstances of a particular public grantee as those presented in the instant case." Brief of MCUA at 33. The third policy is that of ensuring that each federally-assisted waste disposal plant is efficient and economically self-sufficient in its operations. We consider the impact of each of these three policies in turn.
 
 
 36
 (1)
 
 
 37
 With respect to the first policy, the MCUA argues that in passing the Clean Water Act Congress made it clear that it believed that state and local governments could not reach the desired water quality standards without significant amounts of federal financial assistance. Section 101 of the Act, 33 U.S.C. § 1251, for example, states in part that "(i)t is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works." Similarly, the Senate Committee on Public Works emphasized that in tackling the "massive" job of "cleaning up polluted waterways ... States and local governments can go forward only when there is strong assurance that federal funds be available when needed." S.Rep.No. 414 at 35, 1972 U.S.Code Cong. & Ad.News at 3701.[13] In the present case, the MCUA argues that because of mandatory federal water pollution standards, it has no choice but to improve its Sayreville facility, a project for which federal grant money is extremely important. Moreover, the MCUA asserts, Milltown's contribution to the sewage flow at Sayreville is practically insignificant. In withholding funds, then, the EPA-for a trivial reason beyond the MCUA's control-has frustrated the clear congressional policy to ensure through federal funding that local governments improve the quality of their waste disposal facilities; such a "narrow and niggardly approach," the MCUA concludes, Brief of MCUA at 25, cannot have been intended by Congress in enacting section 204(b) (1).
 
 
 38
 It is indisputable, of course, that the Clean Water Act evinces a clear congressional determination that the clean-up of the nation's waters is an important aim, one which requires large amounts of federal financial assistance to state and local governments. It is equally indisputable, though, that Congress placed a number of mandatory conditions on the receipt of such assistance. Indeed Title II is replete with conditions on the grant of aid to sewage construction works, conditions which, in the words of the Senate Report, are intended "to assure that such works are constructed and finally operated and maintained in a manner which will produce the best practicable application of treatment technology." S.Rep.No. 414 at 27, 1972 U.S.Code Cong. & Ad.News at 3693.[14] Unless these conditions are meaningless, the EPA must have the power to cut off funds to nonconforming projects, even when the local public body demonstrates a strong need for the grant money. To hold otherwise would be to conclude that Congress vested authority in the EPA to deny funds only to those projects for which the grant money is not particularly important. Such an interpretation, however, would render the conditions on the grant of federal assistance practically meaningless. Thus, even assuming without deciding that the withholding of funds would indeed seriously burden the MCUA, it certainly could not be contended that that fact alone would justify overturning the EPA's decision to withhold funds for the Sayreville project.
 
 
 39
 The MCUA, however, does not rely solely on the fact of its need for the funds; it also repeatedly asserts that Milltown's noncompliance is a trivial matter. In its brief before this court, the MCUA asserts that Milltown's sewage constitutes only one percent of the average daily gallonage flow at the Sayreville plant, and that the estimated cost of treating Milltown's sewage is only 4.7 percent of the total cost of treating the combined Milltown-New Brunswick sewage flow. Brief of MCUA at 12-13. Thus, the MCUA claims, even assuming that Congress did contemplate that an applicant for Clean Water Act funds would be turned down if it failed to comply with the Act's conditions in some important respect-no matter how great its need for federal assistance-Congress never intended to give the EPA the authority to withhold funds when such an applicant has demonstrated "substantial effectuation of a user charge requirement." Brief of MCUA at 34.
 
 
 40
 We decline the MCUA's invitation to second-guess the EPA's determination that Milltown's complete failure to adopt any user charge system at all is more than an inconsequential matter. To begin with, the district court made no finding of fact that Milltown's contribution to the sewage flow at the Sayreville plant is de minimis.[15] More important, we believe that the determination whether a deviation from the conditions of the Act is important enough to warrant a denial of federal funds is a matter primarily for the EPA and not the courts. We can overturn the EPA's decision to withhold funds from the MCUA's plant at Sayreville only if that decision is arbitrary and capricious. See Hotel Employers Association v. Gorsuch, 669 F.2d 1305, 1307 (9th Cir. 1982). In the present case, the EPA has taken the position that while there is flexibility in designing the user charge system, an outright refusal by one of the users to adopt any user charge system at all is, in itself, a sufficient basis for concluding that the applicant has failed to meet section 204's mandatory requirement that "each recipient of waste treatment services ... will pay its proportionate share ... of the costs ... of any waste treatment services provided by the applicant." 33 U.S.C. § 1284(b)(1) (emphasis supplied). Such a determination, in our view, hardly qualifies as a "clear error of judgment," Hotel Employers Ass'n, 669 F.2d at 1307, and so we will not disturb the EPA's determination that Milltown's failure to adopt a user charge system is more than the trivial matter that the MCUA pictures it to be.
 
 
 41
 (2)
 
 
 42
 For similar reasons, we find unpersuasive the appellants' arguments concerning the flexibility that Congress intended the EPA to show in administering the Clean Water Act grant program. Both the MCUA and Milltown place heavy reliance on the Senate Report accompanying the Clean Water Act, which states:
 
 
 43
 Although the committee is aware of the many different legal and financial circumstances that characterize state and local governments and agencies throughout the country, the bill directs the Administrator to promulgate guidelines for the establishment and imposition of user charge systems as a guide to grant applicants for waste treatment works grants. These guidelines should take into account the diversity of legal and financial factors that exist from jurisdiction to jurisdiction, and each applicant should be permitted reasonable flexibility in the design of a system of user charges that meets the unique requirements of his own jurisdiction. As a general rule, the volume and character of each discharge into a publicly owned system should form the basis of determining the rate at which each user should be required to pay.
 
 
 44
 S.Rep.No. 414, at 28, 1972 U.S.Code Cong. & Ad.News at 3695 (emphasis supplied).[16] According to appellants, the 1914 New Brunswick-Milltown contract is one of those unique "legal and financial circumstances" to which the Senate Report refers. In essence, appellants argue that taking into account the special circumstances created by the Milltown-New Brunswick contract, the MCUA has adopted a "system of user charges" in requiring that every user with whom it has a direct relationship and over whom it can thus exercise some control institute a system of user charges.
 
 
 45
 The EPA, however, takes the position that the flexibility which Congress envisioned relates not to whether a particular user must adopt a user charge system at all, see 40 C.F.R. § 35.929-1(a) ("each user ... (must) pay( ) its proportionate share"), but rather to the precise form that the user charge system takes. Significantly, the Senate Report speaks not of "flexibility" in general, but of "flexibility in the design of a system of user charges." S.Rep.No. 414 at 28, 1972 U.S.Code Cong. & Ad. News at 3695 (emphasis supplied). We see no reason to conclude that the congressional policy of flexibility necessarily extends to the very question of whether a particular recipient of treatment services will adopt a user charge system in the first place.[17]
 
 
 46
 (3)
 
 
 47
 Finally, appellants object to the district court's holding that requiring Milltown to adopt a system of user charges as a condition of the grant would serve the dual purposes of section 204(b)(1), which are to ensure that federally-assisted facilities become economically self-sufficient in their operations, and to promote water conservation by discouraging excessive use of the sewage system. 519 F.Supp. at 883, 885. According to appellants, the aim of financial self-sufficiency is fully assured even without adoption of a user charge system by Milltown; because New Brunswick pays for treatment of Milltown's sewage out of user charges imposed on businesses and residences within New Brunswick, there is no danger that the MCUA will suffer a shortfall in revenues. As the district court pointed out, however, should New Brunswick ever abrogate its contract and cease paying for the treatment of Milltown's sewage, the MCUA would indeed be faced with a revenue shortfall. 519 F.Supp. at 883.[18]
 
 
 48
 Moreover, it is clear that one of the purposes of section 204's user charge requirement is to promote water conservation. See S.Rep.No. 370, 95th Cong.2d Sess. 27, reprinted in 1977 U.S.Code Cong. & Ad.News 4326, 4352 ("A charge to the 'consumer' based on cost of treatment would be a positive force in encouraging more efficient management of wastes discharged through a municipal system as well as an economic inducement to reduce excessive use.").[19] Although Congress in 1977 amended the Clean Water Act to allow charges to be based on ad valorem taxes or flat fees in certain cases rather than on direct measures of sewage flows such as metering, see 33 U.S.C. § 1284(b)(4) (Supp.1982),[20] we cannot agree with appellants that in so doing Congress "eviscerated" any conservation purpose to the user charge requirement. On the contrary, conservation of water is heavily stressed in the legislative history to the 1977 amendments to the Clean Water Act. See, e.g., 1977 U.S.Code Cong. & Ad.News at 4351. In our view, the 1977 amendments were intended simply to provide "greater flexibility ... for the assessment of user charges," id. at 4352, and not to undermine the user charge concept itself or its underlying purposes.
 
 
 49
 Accordingly, we reject the appellants' arguments that the EPA's decision to withhold funds in this case contravenes the underlying policies of the Clean Water Act or constitutes an abuse of discretion.
 
 III.
 
 50
 Milltown's final contention is that if section 204(b)(1) does authorize the EPA's decision to withhold funds, that section unconstitutionally impairs the obligation of a contract.[21] The district court rejected this constitutional challenge, holding that section 204's user charge requirement is reasonably necessary to accomplish a legitimate congressional purpose. 519 F.Supp. at 883-85. In so holding, the district court apparently assumed that section 204(b)(1) does impair the obligation of the New Brunswick-Milltown contract, but determined that such impairment did not run afoul of the constitutional strictures on the contract impairment.[22] While we agree that section 204(b)(1) is constitutional, we do so on a different basis from that relied upon by the district court: in our view, section 204(b)(1) cannot be said to impair the New Brunswick-Milltown contract.[23]
 
 
 51
 The Clean Water Act provides for a grant of funds to the MCUA on the condition that the MCUA comply with certain requirements. Neither the statute itself nor the regulations contain any provision explicitly abrogating contracts such as that between Milltown and New Brunswick. Nor can it be said that section 204(b)(1) implicitly abrogates such contracts. In the present case, it is by no means clear that the EPA's withholding of funds from the MCUA on the basis of Milltown's failure to adopt a user charge system makes abrogation or impairment of the 1914 contract necessary or inevitable. First, the MCUA could forego funding under the Clean Water Act; nowhere in its pleadings or in its brief before this court has the MCUA alleged that completion of the Sayreville project or, for that matter, construction of the dewatering plant, would be impossible without federal funds. Rather, the MCUA has argued that a loss of federal funds will seriously burden it, will cause large and unanticipated increases in expenses to the municipalities participating in the MCUA, and so on. Second, while the MCUA has no control over Milltown, it could simply refuse to accept New Brunswick's sewage, and so qualify for federal funds (at least insofar as the EPA's objections to Milltown's failure to adopt a user charge system are concerned). Neither contingency is necessarily incompatible with New Brunswick's retaining responsibility for Milltown's sewage, as called for in the 1914 contract.
 
 
 52
 To be sure, neither course of action-foregoing federal funds or refusing to accept the New Brunswick-Milltown sewage-would likely be very palatable to the MCUA, Milltown, or New Brunswick as a financial matter, and both alternatives might make it significantly more difficult for the parties to comply with mandatory federal water quality standards. In that sense, it cannot be denied that the EPA's decision to withhold funds makes abrogation of the Milltown-New Brunswick contract a more attractive alternative than it might otherwise be. That fact alone, however, cannot constitute a sufficient basis for deeming section 204(b)(1) to impair the obligation of a contract, for "to hold that motive or temptation is equivalent to coercion (would be) to plunge the law in endless difficulties." Steward Machine Co. v. Davis, 301 U.S. 548, 589-90, 57 S.Ct. 883, 891-92, 81 L.Ed. 1279 (1937).
 
 
 53
 The reason why "temptation" cannot be deemed equivalent to "coercion"-that is, to contract impairment-is not hard to discern. As a general rule, it is clear that "Congress may fix the terms on which it shall disburse federal money to the States." Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981); see King v. Smith, 392 U.S. 309, 333 n.34, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). Moreover, while that power is not without limits, see 451 U.S. at 17 n.13, 101 S.Ct. at 1540, it is indisputable that the power to fix terms lies essentially with the Congress, and not with the federal courts. Yet because a great many if not all conditions on federal grants might very well have an impact on pre-existing contractual arrangements, to hold that every condition of a federal grant program that possibly enhances the likelihood that a contract will be breached is an "impairment of contract" in the constitutional sense, would be tantamount to ruling that virtually every federal funding statute is subject to the heightened judicial scrutiny that is invoked whenever the contract clause is implicated. As a result, no condition in a federal grant program could be upheld unless it was demonstrated to the satisfaction of the courts that the condition represented the only way to achieve an important state purpose. See generally Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). To adopt such an approach would be drastically to undercut Congress' broad discretion to set such terms on federal funding programs as it deems appropriate, and, in consequence to give to the courts extensive power over the conditions that may be attached to the disbursement of federal money. We know of nothing in the Constitution that compels such a result.
 
 
 54
 Accordingly, we decline to give the contract clause the expansive scope that Milltown urges upon us. As a matter of state law, the obligations of the 1914 contract remain untouched by the district court's decision; the user charge requirement of section 204(b)(1) and the applicable regulations do not by their terms purport to abrogate the Milltown-New Brunswick contract, nor do they inevitably require such impairment. In our view, that fact alone is a sufficient basis for rejecting Milltown's constitutional challenge to section 204(b)(1).
 
 IV.
 
 55
 For the reasons expressed in this opinion, we will affirm the judgment of the district court.
 
 
 
 *
 Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 In addition to improving the plant at Sayreville, the MCUA, spurred on by an amendment to the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1412a, is drawing up plans for the possible construction of a "dewatering plant" which would enable the MCUA to end its practice of dumping sewage sludge into the ocean and allow it to dispose of the sludge on land instead. In its third-party complaint for relief against the EPA, the MCUA alleged that in addition to withholding funds for the Sayreville project, the EPA has "refused to award ... grants in aid (of the dewatering project) because of the failure of the Borough of Milltown to adopt and enforce a sewer user charge ordinance." See Appendix at 40
 Claiming that the question of whether the MCUA will in fact have to cease ocean dumping is currently being litigated in several cases pending in various federal district courts, however, the EPA asserts that, because it is not clear that the MCUA will ever have to build the dewatering plant, the question of whether the EPA may withhold funds for that project is not at issue in the present case. Brief of EPA at 4 n.2. On the other hand, though, we note that the district court, apparently referring to the dewatering project, specifically found that "(f)or the same reason (that it has withheld funds for the Sayreville project), the EPA has also refused to approve applications by the MCUA for new grants." City of New Brunswick v. Borough of Milltown, 519 F.Supp. 878, at 881 (D.N.J. 1981). See also affidavit of Sol Seid, P 9, Appendix at 88. We also note that the Clean Water Act provides for grants not only for actual construction, but also for planning and design, see generally Bosco v. Beck, 475 F.Supp. 1029, 1031 (D.N.J.1979), aff'd without opinion, 614 F.2d 769 (3d Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980), so that refusal to approve grant funds could cause harm to the MCUA by "imped(ing) (it) in its progress towards [sic] a land-based alternative for the disposal of sewage sludge," Third Party Complaint of MCUA, Appendix at 22.
 In any event, it makes little difference whether we consider the funds for the dewatering project to be technically "at issue" in the present case, for the EPA's actions with respect to the Sayreville improvements and the dewatering project raise precisely the same question: whether the EPA may withhold Clean Water Act grant funds from the MCUA because Milltown has not adopted a user charge system.
 
 
 [2]
 As subsequently amended, § 204(b)(1) does not require that the user charge system be based on actual sewage or water supply flow; where approval is given by the EPA Regional Administrator, the grantee may employ an ad valorem tax for residential and small non-residential users. See 33 U.S.C. § 1284(b)(4) (Supp.1982); 40 C.F.R. § 35.929-1(b). The effect of these amendments on the present case is discussed in Part II.B., infra
 
 
 [3]
 The district court also noted that
 (i)n an affidavit submitted by the government after oral argument, the EPA has suggested that the withholding of grant money from MCUA is not solely due to Milltown's failure to adopt a user charge system and that at least one other municipality has also failed to meet the requirement.
 
 
 [519]
 F.Supp. at 881 n.3. The MCUA objects to any reference to this other dispute, which is currently pending before this court in a separate appeal at No. 82-5116, on the ground that "the pleadings in this case do not raise an issue of default by any other participant in the system." Brief of MCUA at 15 n.*. We agree with the MCUA that the question of whether other municipalities whose sewage is treated by the Sayreville plant have complied with the user charge requirement is not before this court in the present case, and for that reason we do not take into account the alleged noncompliance of any recipient of the MCUA's services other than Milltown in determining whether the EPA is authorized to withhold funds for the Sayreville plant
 
 
 [4]
 Under the applicable regulations, the EPA's Regional Administrator may not "pay more than 50 percent of the Federal share of any (construction project, such as the improvement and expansion of the Sayreville plant) ... unless the grantee (the MCUA) has submitted adequate evidence of timely development of its system of user charges(,) nor shall the Regional Administrator pay more than 80 percent of the Federal share unless he has approved the system." 40 C.F.R. § 35.935-13(a)(1)
 
 
 [5]
 The district court correctly observed that while the contract clause, U.S.Const. art. I, Sec. 10, cl.1("No State shall ... pass any ... Law impairing the Obligation of Contracts ..."), does not apply to the federal government, the fifth amendment's prohibition of the deprivation of property without due process places constraints on the federal government with respect to contract impairment that are similar to those placed on the states by the contract clause. 519 F.Supp. at 878; see Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). See generally L. Tribe, American Constitutional Law, § 9-5, at 465 n.1 (1978). For ease of reference, therefore, we will refer to both constraints under the rubric of the "contract clause."
 
 
 [6]
 The MCUA also argued that the Clean Water Act in effect required it to commit tortious interference with the contract between Milltown and New Brunswick. 519 F.Supp. at 885
 
 
 [7]
 MCUA also raised an estoppel argument before the district court which it has not raised on appeal. See id. at 885-86. Thus that issue is not before us
 
 
 [8]
 Neither the EPA nor New Brunswick has taken an appeal from the district court's order of September 9, 1981. Thus they do not contest the portion of the district court's order remanding the case to the state courts for a determination of the validity of the Milltown-New Brunswick contract. See Order of September 8, 1981, PP 2 and 3. Moreover, while Milltown has taken an appeal from the district court's order, it does not contest that order insofar as it remands the case to state court for determination of the remaining state law issues. See Brief of Milltown at 26; Appendix at 105
 The MCUA's position with respect to remand is slightly less clear, but it does not appear that the MCUA contests the remand on appeal. In its "Amended Notice of Appeal," the MCUA did list the remand order as one of the issues it would contest on appeal. Appendix at 132. On the other hand, in its motion for summary judgment before the district court-the district court's disposition of which is now before this court on appeal-the MCUA limited itself to the federal issue of the EPA's authority to withhold funds based on Milltown's failure to adopt a user charge system. More important, in its opening brief and reply brief before this court, the MCUA has not made any mention of the remand, and accordingly appears to have decided not to contest the remand.
 In view of the parties' positions with respect to this aspect of the district court's order, we have no occasion to address the issue of remand.
 
 
 [9]
 As noted earlier, § 204(b)(1) requires that "each recipient of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, ... pay its proportionate share ... of the costs of operation and maintenance ... of any waste treatment services provided by the applicant." 33 U.S.C. § 1284(b)(1)
 
 
 [10]
 As the MCUA puts it, the user must be "legally subject to the legislative and enforcement 'jurisdiction' of the 'applicant' for a grant." Brief of MCUA at 17
 
 
 [11]
 The EPA points to statements in the legislative history of the Clean Water Act, such as the comment in the Senate Report that "(a)s a general rule, the volume and character of each discharge into a publicly owned system should form the basis of determining the rate at which each user should be required to pay." S.Rep.No. 414, 92d Cong., 1st Sess. 28 (1971), reprinted in Staff of Senate Comm. on Public Works, 92d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1446 (Comm. Print 1973), and in 1972 U.S.Code Cong. & Ad.News 3668, 3695 (hereinafter "S.Rep.No. 414"). In our view, however, these general statements shed no more light on the meaning of the particular phrase, "within the applicant's jurisdiction," than does, for example, the language of 40 C.F.R. § 35.929-1(a)
 
 
 [12]
 We note that we do not today hold that Milltown must become a "subscriber" to the MCUA facility as a condition of the MCUA's grant. The only requirement imposed by our decision to uphold the EPA's action is that, so long as the MCUA receives federal funding and continues to treat Milltown's sewage, Milltown must adopt a system of user charges
 
 
 [13]
 See also Train v. City of New York, 420 U.S. 35, 45 n.10, 95 S.Ct. 839, 845 n.10, 43 L.Ed.2d 1 (1975) (referring to necessity of federal financial aid "to finance the construction of waste treatment facilities which will meet the standards imposed by" the Clean Water Act)
 
 
 [14]
 The user charge requirement, moreover, fully satisfies the rule that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 24, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Thus we fail to see how Pennhurst in any way undermines the EPA's position, as Milltown asserts
 
 
 [15]
 For obvious reasons, moreover, we cannot accept the MCUA's argument that the amount of sewage flowing from Milltown into the Sayreville plant is a "legislative fact," or a fact of which we can take "judicial notice." The doctrines of "legislative facts" and "judicial notice" are not talismans by which gaps in a litigant's evidentiary presentation before the district court may be repaired on appeal
 
 
 [16]
 See also 33 U.S.C. § 1251(b) ("It is the policy of Congress that the States manage the construction grant program ...."); Senate Debate on S. 2770, November 2, 1971, reprinted in Staff of Senate Comm. on Public Works, 92d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1353 (remarks of Senator Muskie) ("the flexibility point is emphasized, and I think should be, because we are trying to encourage experiments and flexibility")
 
 
 [17]
 In Garden State Paper Co. v. County Sanitation District No. 21, Civil No. 78-0042-IH (C.D.Cal. February 6, 1980) (unreported bench opinion), a sanitation district which had applied for and received Clean Water Act grants for a sewage project sought to abrogate a contract which it had with one user, on the ground that the contract did not incorporate a user charge system. See 40 C.F.R. § 35.929-2(g) ("The user charge system shall take precedence over any terms or conditions of agreements or contracts between the grantee and users...."). The district court held, among other things, that that regulation was invalid:
 (T)he (Clean Water Act) does not require that a system of charges which otherwise meets its criteria should also provide for the abrogation of an existing contract and does not authorize a regulation which would so require.... (T)he performance of a preexisting contract, otherwise valid, for the length of its term, is not a violation of the statute so long as the rate system adopted by the applicant and in effect requires of all other users their proportionate share of costs.
 Similarly, the MCUA argues, the Clean Water Act should not be read as requiring the abrogation of a pre-existing contract between two users such as Milltown and New Brunswick, so long as the grantee has adopted a system of user charges for all other users.
 The Garden State court, however, pointed to no authority in support of its reading of the Clean Water Act; nor are we aware of any. Rather, the Garden State court was influenced by its premise that if the regulation were held to be valid, the statute would violate the constitutional prohibition against the impairment of contracts. We reject that premise, see Part III, infra, and we reject the argument that the congressional policy of flexibility excuses the MCUA from effectuating full compliance with § 204(b)(1).
 Appellants also rely upon Hotel Employers Ass'n v. Gorsuch, 669 F.2d 1305 (9th Cir. 1982), in support of their "flexibility" argument. Hotel Employers involved a challenge to the EPA's approval of a particular form of user charge system, a challenge which the court rejected on the ground that the EPA's interpretation of § 204(b)(1) had a "rational basis." In our view Hotel Employers stands for the proposition that the courts will defer to the EPA's exercise of the flexibility that it undoubtedly has in administering the Clean Water Act grants, and will not substitute their own judgment for the EPA's. Thus we read Hotel Employers as entirely consistent with our holding in the present case.
 
 
 [18]
 Relying on the fact that the New Brunswick-Milltown contract is still binding as a matter of state law, appellants discount the concern that New Brunswick might breach the contract as a makeweight. We see no reason, however, to discount the possibility that-whether through choice, judicial decision, or financial inability-New Brunswick might someday cease paying for treatment of Milltown's sewage, regardless of whether the contract is still in effect. And such an action would leave the MCUA open to precisely the kind of revenue shortfall that all the parties agree the statute was intended to avoid. See S.Rep.No. 414 at 28
 
 
 [19]
 Appellants object to any reliance on the legislative history to the 1977 amendments to the Clean Water Act. In this case, however, water conservation is an obvious if unstated goal of the 1972 Act, as evidenced by the Comptroller General's decision in 1974 that section 204(b)(1) did not permit ad valorem taxes because such taxes would not promote the purpose of water conservation served by user charges. 54 Comp.Gen. 1, 5 (1974). When Congress amended section 204 to permit ad valorem taxes as an alternative to user charges, it explicitly preserved the water conservation objective by requiring users to be notified of the portion of their bill attributable to the cost of water treatment. A Legislative History of the Clean Water Act of 1977, 95th Cong., 2d Sess. (Comm. Print 1978), at 439 (statement of Senator Muskie, who also was manager of the 1972 bill). Under the circumstances the 1977 legislative history merely acknowledges the water conservation goal already implicit in the Act. Cf. North Haven Board of Education v. Bell, --- U.S. ----, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982)
 
 
 [20]
 An ad valorem tax system is one based on property values; a flat fee charge is one assessed "per household or per plumbing fixture (such as a sink or toilet)." See generally 40 C.F.R. § 35.929-1(b); 1977 U.S.Code Cong. & Ad.News at 4351
 
 
 [21]
 Though both the MCUA and Milltown pressed this argument before the district court, only Milltown now raises the constitutional objection to § 204
 
 
 [22]
 The district court did note that the "MCUA is under no obligation to apply for grant funds from EPA," but it made that observation in the context of the MCUA's argument that the user charge requirement, as applied to the present case, amounted to "punishing" the MCUA for something over which it had no control. In analyzing the contract clause question, on the other hand, the district court appears to have assumed that § 204(b)(1) did cause an "impairment" of the New Brunswick-Milltown contract for purposes of the contract impairment clause, and then reached the merits of the question whether such an impairment was constitutionally valid. See 519 F.Supp. at 883-85
 
 
 [23]
 Thus, we neither approve nor disapprove the district court's analysis on the merits of the contract clause issue