CITY OF NEW BRUNSWICK, Plaintiff,

v.

BOROUGH OF MILLTOWN and the Middlesex County Utilities Authority (formerly Middlesex County Sewerage Authority), Defendants,

v.

The MIDDLESEX COUNTY UTILITIES AUTHORITY (formerly Middlesex County Sewerage Authority), Defendant-Third Party Plaintiff,

v.

The UNITED STATES of America, by and through its Environmental Protection Agency, Third Party Defendant.

Civ. A. No. 80–4040.

United States District Court,
D. New Jersey.

Aug. 11, 1981.

880

James M. Cahill, Asst. City Atty., City of New Brunswick, New Brunswick, N. J., for plaintiff, City of New Brunswick.

Robert S. Sequin, Booream & Sequin, Milltown, N. J., and Roger S. Clapp, Arnold K. Mytelka, Clapp & Eisenberg, P.S., Newark, N. J., for defendant, Borough of Milltown.

Francis X. Journick, Richard P. Daingerfield, Wilentz, Goldman & Spitzer, P.C., Woodbridge, N. J., for defendant-third party plaintiff, The Middlesex County Utilities Authority (formerly Middlesex County Sewerage Authority).

William W. Robertson, U. S. Atty. by Rosanne Mayer, Pollution Control Section, Land and Natural Resources Division, U. S. Dept. of Justice, Washington, D.C. by Lee Dehihns, Acting Asst. Gen. Counsel, for Grants Office of General Counsel Environmental Protection Agency, Washington, D.C., for third party defendant, Environmental Protection Agency.

DEBEVOISE, District Judge.

This case presents a challenge to the Environmental Protection Agency's [EPA] decision to withhold part of its grant funds from the Middlesex County Utilities Authority [MCUA] because the Borough of Milltown, whose waste water is treated by the MCUA, had failed to adopt a system of user charges to pay for its proportionate share of the MCUA facility as mandated by section 204(b)(1) of the Clean Water Act, 33 U.S.C. § 1284(b)(1). The legal challenge began in August, 1980 when the City of New Brunswick instituted suit in the Superior Court of New Jersey, Chancery Division, Middlesex County, against Milltown and the MCUA, seeking an injunction and declaration that a 1914 contract between itself and Milltown, which obligates New Brunswick to receive and dispose of Milltown's sewage without cost, was void on several grounds, including allegations based on EPA regulations:

> Federal Rules and Regulations governing the Middlesex County Sewerage Authority must be made applicable to all users of the system, including the Defendant, Borough of Milltown, regardless of whether or not the user has a direct contract with the Sewerage Authority.

Complaint, ¶ 4, Third Count.

New Brunswick further alleged:

> [U]nder such Rules and Regulations such users of the Sewerage Authority's facilities must pay their fair share of the cost of operating and maintaining the Sewerage Authority's treatment works.

Complaint, ¶ 5, Third Count.

In November, 1980, MCUA brought the Environmental Protection Agency into the state court litigation by naming it as a third-party defendant. In its cross-complaint, MCUA alleged that neither the Clean Water Act nor its implementing regulations requires that Milltown adopt a system of user charges and that, even if they did, such a requirement would constitute an unconstitutional abrogation of the 1914 contract. EPA removed this action to the Federal District Court under 28 U.S.C.

§ 1442(a)(1)[1] in December, 1980, and has answered and counterclaimed against all other parties, seeking a declaration that section 204 authorizes EPA to withhold grant funds from MCUA pending adoption of the user charges by Milltown and an injunction requiring Milltown to adopt such user charges or, alternatively, to cease sending its sewage through MCUA's facility for treatment.

All parties now move for partial summary judgment with respect to the federal issues presented in this litigation: Whether section 204(b)(1) of the Clean Water Act, 33 U.S.C. § 1284(b)(1), and its implementing regulations, 40 C.F.R. § 35.900, *et seq.*, authorize EPA to withhold grant funds from MCUA prior to the adoption of sewer user charges by Milltown, and whether the enforcement of a user charge system would cause an unconstitutional impairment of Milltown's contract with New Brunswick in violation of the Fifth Amendment?

There is no dispute concerning the material facts in this case. As already mentioned, in 1914 the City of New Brunswick entered into a contract with the Borough of Milltown under which New Brunswick agreed to receive and dispose of Milltown's sewage without charge in exchange for Milltown's promise to discontinue its practice of discharging sewage into the Lawrence Brook, a source of drinking water for New Brunswick. On two separate occasions, New Jersey courts have upheld the validity of this contract. *City of New Brunswick v. Borough of Milltown*, 3 N.J. Super. 113, 65 A.2d 621 (App.Div.1949); *City of New Brunswick v. Borough of Mill-*

*town*, 135 N.J.Eq. 310, 38 A.2d 288 (Ch. 1944).

As a result of this contract, the sewage from Milltown flows free of charge from Milltown to New Brunswick, and the combined flows from the two municipalities are treated at the MCUA plant. New Brunswick pays MCUA for its own and for Milltown's sewage at a rate set by the MCUA. Milltown pays nothing to New Brunswick or to MCUA and has not, to date, adopted a system of sewer user charges to pay for its proportionate share of waste treatment.

MCUA is currently expanding its Sayreville plant and is planning to build a sludge dewatering facility to aid its disposal of solid wastes on land which is mandated after December 31, 1981 by the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1401, *et seq.* To help defray the costs of its projects, the MCUA has applied for and been awarded various grants from the EPA. At present, payments under one outstanding grant agreement have been withheld because of MCUA's failure to meet the User Charge requirements.[2] This grant agreement, adopted on August 30, 1976, contains an express condition notifying MCUA that payments under the grant may be subject to withholdings in excess of 50% and/or 80% of the grant amount "for failure to comply with the requirements as to industrial cost recovery and user charge systems ...". (*See* Exhibit B attached to the Supplemental Affidavit of Sol Seid.) For the same reason, the EPA has also refused to approve applications by the MCUA for new grants.[3]

---

1. 28 U.S.C. § 1442(a)(1) permits removal of a civil action commenced in a state court against "any officer of the United States or agency thereof" to the United States District Court. For a general discussion of the power of the federal government to have actions brought against its officers or agencies removed to the federal forum under this statute *see Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969).

2. There is one other grant agreement between the MCUA and the EPA for which payments remain outstanding. That agreement, approved on January 16, 1973, contains no user

charge system requirement since it was accepted before the user charge system was mandated by the Federal Water Pollution Control Act Amendments of 1972 (Pub.L. 92–500) (*see* Exhibit A attached to the Supplemental Affidavit of Sol Seid). Consequently, no payments under this grant have been withheld because of Milltown's refusal to adopt a User Charge System. (*See* Affidavits of Edward Markus and Allan Jacobs.)

3. In an affidavit submitted by the government after oral argument, the EPA has suggested that the withholding of grant money from MCUA is not solely due to Milltown's failure to

Defendants MCUA and Milltown both contend that section 204 should not apply to Milltown on the theory that Milltown is not a "recipient" of waste treatment services from the MCUA. According to the defendants' reading of the statute and its implementing regulations, Milltown is not a recipient for two reasons: (i) Milltown does not discharge waste water into the MCUA system directly; rather, it disposes of its waste water by transmitting it to New Brunswick in accordance with the contractual relationship between those two municipalities; and (ii) Milltown is not a "subscriber" to services provided by MCUA. If section 204 is found to apply to Milltown, defendants argue, in the alternative, that section 204 is unconstitutional since it would abrogate an existing contract between Milltown and New Brunswick, and that the EPA's decision "to force the MCUA to exact user charges from Milltown" is wholly irrational and contrary to public policy. EPA, on the other hand, interprets both section 204 and the regulations, particularly 40 C.F.R. § 35.929–2(e), as applying to the situation here and as requiring Milltown to pay user charges before full grant funds may be transferred to the MCUA. EPA further maintains that the section is fully constitutional and that the decision to enforce the user charge requirement is rational.

Under section 204(b)(1) of the Clean Water Act, 33 U.S.C. § 1284(b)(1), the EPA Administrator may not approve any grant for sewage treatment facilities

> unless he shall first have determined that the applicant (A) has adopted or will adopt a system of charges to assure that *each recipient* of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, *will pay* its proportionate share ... of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant ... (emphasis added).

adopt a user charge system and that at least one other municipality has also failed to meet

Neither the Act nor the regulations define who is a "recipient" of waste treatment services from the grantee, 33 U.S.C. § 1292; 40 C.F.R. § 35.905. Recipient is defined in *Webster's New Collegiate Dictionary* (1975) as "one that receives". To receive is defined as "to come into possession of" or "to acquire".

■ Given the plain meaning of "recipient" and the great deference to be accorded to statutory interpretations by the agency charged with its administration, *EPA v. National Crushed Stone Association,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), I find that Milltown is a recipient of waste treatment services within the meaning of section 204 of the Clean Water Act. The fact that Milltown itself does not directly place its own waste into the MCUA system or require that its waste water be treated by MCUA is not material. Since Milltown's waste water is discharged through New Brunswick into the MCUA system and receives its only treatment from the MCUA system, Milltown is inarguably a "recipient" of MCUA's treatment services.

■ Moreover, the fact that Milltown does not have a subscription contract with MCUA has no bearing on the defendants' claims here because the application of the statute is not limited to subscribers. The statute itself does not refer to subscribers but only to recipients of waste treatment services. The regulations specifically deal with municipalities contributing wastes to the treatment works regardless of whether such municipalities are "subscribers". While 40 C.F.R. § 35.929–2(e) provides that if the application is for a "regional treatment system accepting wastewaters from other municipalities" all "subscribers" must adopt user charge systems, the regulation also continues to require that *all* municipalities contributing wastes to the system to adopt user charges:

> These user charge systems shall also be incorporated in appropriate municipal legislation enacted or other appropriate

the requirement (*see* Affidavit of Edward Markus, ¶ 7).

authority of *all municipalities contributing to the treatment works* . . . (emphasis added).

Similarly, 40 C.F.R. § 35.929–1, which sets forth the general requirement for user charge systems, does not limit the user charge requirements to the grantee's ".subscribers". If the grantee's user charge system is based on actual use, that system may be approved "if each *user* . . . pays its proportionate share of operation and maintenance . . . costs". 40 C.F.R. § 35–929–1(a) (emphasis added). Thus, even though Milltown does not have a subscription contract with MCUA it nonetheless must adopt user charges before MCUA may receive full grant funds from EPA.

My interpretation of the Act's user charge requirements and its implementing regulations is consistent with the underlying purposes and policies of the Act. Legislative history reveals that Congress' purpose in providing for a user charge system was twofold: first, it was enacted "as a means of assuring that each federally assisted facility would have adequate operation and maintenance funds", and, second, the system was intended to be "a positive force in encouraging more efficient management of wastes discharged through a municipal system as well as an economic inducement to reduce excessive use". S.Rep.No.95–370, 95th Cong., 1st Sess. (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 4326, 4352. Requiring Milltown to pay for its proportionate share of the cost of operation and maintenance for the MCUA facility clearly furthers the joint objectives of conservation and financial security. Unless Milltown adopts its own system of user charges there is simply no incentive on individual or industrial users within Milltown to decrease their water consumption and thereby decrease discharges in the MCUA facility. Moreover, should New Brunswick break its contract with Milltown and cease paying for the costs of treating Milltown's wastes, MCUA would, in the absence of a user charge system in Milltown, be faced with a revenue shortfall.

Defendants point to legislative history which also reflects a congressional determination that EPA "take into account the diversity of legal and financial factors that exist from jurisdiction to jurisdiction" and that EPA permit to each applicant "reasonable flexibility in the design of a system of user charges that meet the unique requirements of his own jurisdiction". S.Rep.No. 92–414, 92nd Cong., 2nd Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad. News, 3668, 3695. This flexibility, however, is qualified by the further determination that "[a]s a general rule, the volume and character of each discharge into a publicly owned system should form the basis of determining the rate at which each user should be required to pay". *Id.* Thus, to fulfill the purposes of the Act, Milltown must be considered a "recipient of waste treatment services" within MCUA's jurisdiction, and must adopt a system of user charges as required by section 204 and its implementing regulations.

Having determined that the Clean Water Act authorizes the EPA to withhold grant funds from the MCUA in these particular circumstances, the question must now be addressed whether the Act so interpreted unlawfully impairs Milltown's contract with New Brunswick or is otherwise invalid or contrary to public policy.

The Contract Clause protects against actions by states impairing the obligations of contracts.[4] A similar measure of protection against contract impairment by the federal government is given by the Fifth Amendment's provision that no person shall be deprived of property without due process. *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1933); *Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1930).

Although the prohibition appears to be absolute, neither the contract clause nor the due process clause invalidates every action

---

4. The Contract Clause is contained in Article I, Section 10, Clause 1 to the United States Constitution and states, in relevant part: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . .".

by the government which interferes with a contract:

> [The government] must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements. This principle is summarized in Mr. Justice Holmes' well-known dictum: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them.' *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).

*United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977).

Thus, the Court has recognized that the government does have the right to impair existing contractual obligations if the contemplated action is reasonably necessary to further a legitimate public purpose:

> Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.

*Id.* at 22, 97 S.Ct. at 1518.

*Accord, Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).[5] Moreover, when reviewing such legislation, courts generally defer to the legislative judgment as to the necessity and reasonableness of the Act. *United States Trust Co. v. New Jersey, supra*, 431 U.S. at 23, 97 S.Ct. at 1518.

■ In enacting section 204 and requiring the adoption of user charges applicable to all users as a prerequisite to the receipt of EPA grant funds, Congress was acting in its sovereign capacity to protect the environment, pursuant to its commerce power and its power to protect the public health and welfare. Since the protection of the environment is a legitimate public purpose, section 204 must be upheld if it is reasonably necessary to accomplish this purpose.

■ The requirements of section 204 may impair the obligations of an existing contract only after a grantee has chosen to apply to EPA for construction grant funds. As such, the user charge requirement is not an automatic abrogation of all contracts involving charges for sewage treatment, but only a reasonable condition to the availability of financial assistance. Terms and conditions to federal financial assistance uniformly have been upheld against constitutional attack if those terms and conditions are reasonably related to the statutory goal. *See King v. Smith*, 392 U.S. 309, 333,

---

5. In *Allied Structural Steel Co. v. Spannaus*, the Supreme Court recently struck as an impermissible violation of the Contract Clause of the Constitution a Minnesota statute which subjected the plaintiff company to a "pension funding charge" if the company terminated its pension plan or closed a Minnesota office. In so holding, the Court applied the standard set in the *United States Trust Co.* case of a reasonable necessity to further a legitimate public purpose, and considered persuasive four factors: that (i) "[t]he law was not even purportedly enacted to deal with a broad, generalized economic and social problem", (ii) the law "invaded an area never before subject to regulation by the State", (iii) the law "worked a severe, permanent, and immediate change in those relationships—irrevocable and retroactively", and (iv) "its aim was leveled ... only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees." 438 U.S. at 250, 98 S.Ct. at 2725. None of these factors are present in the instant suit. First of all, the Clean Water Act was enacted to deal with a recognized social problem—that of pollution and water conservation. Second, the Act operates in an area already clearly subject to extensive regulation by both the state and federal government. Third, the user charge system need not work a severe or permanent change in the contractual relations between Milltown and New Brunswick since they can continue their relationship simply minus the EPA's grant money. And, finally, the aim of the user charge system was clearly leveled at *all* users of the waste treatment system and not at just a few special participants. Thus, the Court's conclusion in *Allied Structural Steel* that "if the Contract Clause means anything at all, it means that Minnesota could not constitutionally do what it tried to do to the company [providing the pension fund]", does not require a similar result in this case.

88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968); *Massachusetts v. Mellon*, 262 U.S. 447, 480, 43 S.Ct. 597, 598, 67 L.Ed. 1078 (1923).

Moreover, Congress determined that a significant incentive for water conservation would be to provide individual dischargers into a municipal waste treatment facility with a financial incentive to conserve water. S.Rep.No.95–370, 95th Cong., 1st Sess. (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 4326, 4351–52. User charges clearly provide such an incentive to each discharger into a waste treatment system. In light of the deference to be accorded the Congressional determination concerning these financial incentives and their relationship to water conservation, *United States Trust Co. v. State of New Jersey, supra*, I find the specific tool employed by Congress in section 204—requiring the establishment of user charge systems as a prerequisite to federal financial assistance—to be reasonably necessary to protect the environment and achieve the specific goals of water conservation and a decrease in water pollution.[6]

■ MCUA's final argument is that in requiring Milltown to adopt user charges prior to disbursement of full grant funds to MCUA, section 204 is contrary to public policy. MCUA first contends that it has no power to compel Milltown to adopt user charges and, therefore, EPA is "punishing" MCUA for something over which it has no control. MCUA also contends that section 204 requires MCUA to tortiously interfere with Milltown's contract with New Brunswick.

The arguments that EPA is "punishing" the MCUA and requiring MCUA to commit a tort against Milltown overlook the fact that MCUA is under no obligation to apply for grant funds from EPA. Its obligation to comply with the treatment and discharge requirements of the Clean Water Act is completely independent of the receipt of any financial assistance from the government. *State Water Control Board v. Train*, 559 F.2d 921 (4th Cir. 1977). Only after it applied to EPA for grant funds was MCUA obliged to comply with all requirements and conditions of the construction grants program, including the user charge requirement. *See Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.*, 446 F.2d 1013, 1027–28 (5th Cir. 1971). EPA has in no way forced MCUA into anything. MCUA freely applied to EPA for grant assistance, and the EPA, in providing the assistance, expressly stated the grant program requirement of user charges. If the conditions imposed on the MCUA for the grant money force it to interfere tortiously with Milltown's contract with New Brunswick, the obvious and simple solution for MCUA is to withdraw its grant application.

■ At oral argument on this motion the possibility of an estoppel argument was raised for the first time and, on the Court's direction, briefed by the parties. In short, it is the contention of MCUA that EPA should be estopped from requiring Milltown to pay user charges since it was more than

---

6. MCUA's argument to the contrary relies primarily on an unreported oral decision of the Central District of California. *Garden States Paper Co., Inc. v. County Sanitation District No. 201 of Los Angeles County*, No. 78–0042–IH (C.D.Cal. Feb. 6, 1980). That case, however, is unpersuasive authority. In determining that the imposition of user charges which would contravene an existing contract was not reasonably necessary to induce improved water quality, the *Garden State* court merely focused on the one contract and industrial discharger that was before it. The Court found that there had been no showing that the abrogation of the single contract at issue would make any real difference on the level of general water pollution. However, given the Congressional determination that the imposition of user charges on all dischargers into a waste treatment facility would be the best incentive to conserve water and abate water pollution, the *Garden State* Court erroneously substituted its own judgment that user charges were not necessary to abate pollution in the one case before it. *See Minnesota v. Clover Leaf Creamery*, 449 U.S. 457, 463–464, 101 S.Ct. 715, 723–724, 66 L.Ed.2d 659, 668–669 (1981). For this reason, I decline to follow the reasoning of the *Garden State* Court. *Cf. Time Container of Monroe v. Alexander*, No. 77–725 97 (E.D.Mich. Dec. 8, 1980) (where the Court upheld the requirement of the user charge system despite its inconsistency with an existing contract).

five years after the original Grant Agreement was entered into in 1973 that EPA first mentioned the obligation of a user charge system with respect to the Borough. According to Sol Seid, Executive Director of the MCUA, had EPA made it clear at the time it offered the grants that the Borough of Milltown would be required to adopt a sewer user charge system, the Authority would not have agreed to accept the grants. Contrary to the MCUA's description of the events, however, the EPA did, in fact, make its position with respect to a user charge system as clear as possible. The user charge system became a mandatory condition to the receipt of funds after the 1973 grant agreement was approved and therefore notice of its requirements is relevant only to the second grant application submitted by MCUA in 1976.[7] Although the 1976 grant agreement does not specifically mention Milltown by name, it did specifically condition payment of the grant on compliance with the requirements as to "user charge systems in 40 C.F.R. § 35.935–13." This is the provision under which EPA is withholding the grant funds from MCUA at approximately 80% of the total grant. Moreover, when MCUA first informed EPA of the Milltown situation in early to mid-1979 (well after the 1976 grant had been approved), the department immediately notified MCUA of its obligation to obtain the adoption by Milltown of a user charge system, even though Milltown was an indirect discharger into the MCUA system through the New Brunswick facilities and had entered into no subscriber's agreement with MCUA. The EPA had consistently maintained this position with the MCUA. (See Affidavit of Edward Markus, Chief of the Raritan-Passaic Section of the New Jersey/Caribbean Water Programs Branch of the Region II Office of the EPA.) In view of the clear condition expressed in the 1976 grant agreement and the EPA's unequivocal stance in this matter, there is no basis for an estoppel theory of relief.

In conclusion, I find that section 204(b)(1) of the Clean Water Act, 33 U.S.C. § 1284(b)(1), and its implementing regulations authorize EPA to withhold grant funds from the MCUA until such time as the Borough of Milltown adopts a system of user charges as required by the Act. Because the EPA's options under the Act are limited to granting or not granting the funds to the Authority and do not include the power to order Milltown's generators of sewage to pay their share of costs, I decline to order the Borough of Milltown to adopt a user charge ordinance or to cease sending its sewage through MCUA's facility for treatment.

The consequences of the disposition of the summary judgment motions set forth below will be to deny all requests for relief which MCUA seeks against EPA in its third party complaint, requiring its dismissal. A further consequence of the disposition of the summary judgment motion will be to grant the first and third requests for relief set forth in EPA's counterclaim against MCUA and to deny its second request for relief.

Upon entry of the order disposing of the summary judgment motion EPA, which removed this case to this Court, will no longer be a party to these proceedings. The only issues remaining will be state issues which should be resolved by the state courts. Critical to the outcome of the case is resolution of the question whether the dramatic change in circumstances occasioned by the availability of financing under the Clean Water Act and the conditions imposed for the granting of such financing have any effect upon the pre-World War I contract between New Brunswick and Milltown which now stands as a bar to such financing. That is a question of state law which should be resolved in the state courts (or legislature).

Turning to the individual motions for summary judgment, they will be disposed of as follows:

1. MCUA's motion for summary judgment for MCUA and against EPA "ordering review and approval of grant applications and payment of grant funds in accord-

ance with the provisions of the Clean Water Act ... and the regulations promulgated pursuant thereto without regard to whether [Milltown] has adopted a sewer user charge ordinance until such time, if ever, as [Milltown] commences subscribing to services provided by [MCUA]"—denied.

2. Milltown's motion for an order

(a) Entering summary judgment in favor of Milltown against EPA on the counterclaim by EPA against Milltown—granted.

(b) Entering summary judgment in favor of Milltown against MCUA on its cross-claim against Milltown—denied without prejudice in order that the questions raised may be resolved by the Courts of the State of New Jersey.

(c) Entering summary judgment against the City of New Brunswick on the Third Count of the Complaint—denied without prejudice in order that the questions raised may be resolved by the Courts of the State of New Jersey.

(d) Dismissing the remaining Counts of the Complaint without prejudice—denied.

(e) Remanding this action to the state court—granted.

3. New Brunswick's motion for summary judgment in favor of New Brunswick against Milltown and MCUA ordering Milltown to adopt a user charge ordinance and to pay its proportionate share of the treatment of its waste water in accordance with the provisions of the Clean Water Act and the regulations promulgated pursuant thereto—denied without prejudice in order that the questions raised may be resolved by the Courts of the State of New Jersey.

4. EPA's motion for summary judgment in EPA's favor on MCUA's complaint and declaring that Section 204(b)(1) of the Clean Water Act and its implementing regulations authorize EPA to withhold grant funds from MCUA until such time as Milltown adopts a system of user charges as required by the Act—granted.

No costs will be allowed to any party.

EPA is requested to submit an order consistent with this opinion, giving the other parties seven (7) days to notify the Court of any objections to its form or substance.