MIDDLESEX COUNTY UTILITIES AUTHORITY

v.

BOROUGH OF SAYREVILLE, et al., Appellants,

v.

William French SMITH, United States Attorney General, et al.

No. 82–5116.

United States Court of Appeals, Third Circuit.

Submitted under Rule 12(6) July 30, 1982.

Decided Oct. 12, 1982.

Certiorari Denied March 7, 1983. See 103 S.Ct. 1273.

William S. Greenberg, (argued), Greenberg, Kelley & Prior, Trenton, N. J., for appellants.

Milton B. Conford, (argued), Wilentz, Goldman & Spitzer, P. C., Woodbridge, N. J., Lee A. DeHihns, III, Acting Asst. Gen. Counsel, U. S. Environmental Protection

Agency, Rosanne Mayer, (argued), U. S. Dept. of Justice, Washington, D. C., for appellees.

Before GIBBONS and HUNTER, Circuit Judges, and POLLAK,* District Judge.

## OPINION OF THE COURT

POLLAK, District Judge.

The Middlesex County Utilities Authority ("MCUA") is a public body established, pursuant to New Jersey law, by the Board of Freeholders of Middlesex County.[1] In 1954, MCUA entered into an Agreement with twenty-four municipalities and several industrial enterprises in Middlesex, Somerset and Union Counties, pursuant to which MCUA undertook to build and operate a trunk sewer system together with a sewage disposal plant to be located at Sayreville. With the adoption in 1972 of the Federal Water Pollution Control Act, more commonly known as the "Clean Water Act," MCUA, like other public sewage treatment systems, became subject to comprehensive federal legislative prohibitions on discharging pollutants into waterways—prohibitions which, together with those applicable to private pollution sources, are intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

By 1975, it was apparent to MCUA that it would have to expand and modernize its trunk system and the Sayreville facility. To accomplish this, MCUA decided to apply to the Environmental Protection Agency (EPA) for a construction grant pursuant to Title II of the Clean Water Act, which, with a view to helping public sewage treatment systems achieve compliance with federal anti-pollution standards, authorizes the EPA Administrator to fund up to 75% of the cost of building or improving sewage systems. As a predicate for applying for a grant, MCUA and its customer municipalities and industries entered into a Supplemental Agreement amending the 1954 Agreement in the respects necessary "to obtain grants for the construction of wastewater facilities." Supplemental Agreement, p. 2. Among the amendments were a provision that "[t]he Authority and each Municipality represents and agrees that it will adopt a system of user charges ... which, at a minimum, complies with the rules and regulations of the EPA," and a companion provision obligating each municipality to "secure passage of a sewer use ordinance or resolution." Supplemental Agreement, pp. 4 and 5. These undertakings were intended to meet the directive of Section 204(b)(1) of the Clean Water Act that:

> ... the Administrator shall not approve any grant for any treatment works ... unless he shall first have determined that the applicant ... has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, will pay its proportionate share ... of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant ...[2]

> In any case where an applicant which, as of December 27, 1977, uses a system of dedicated ad valorem taxes and the Administrator determines that the applicant has a system of charges which results in the distribution of operation and maintenance costs for treatment works within the applicant's jurisdiction, to each user class, in proportion to the contribution to the total cost of operation and maintenance of such works by each user class (taking into account total waste water loading of such works, the constituent elements of the wastes, and other appropriate factors), and such applicant is otherwise in compliance with ... this paragraph ... then

* Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. The Authority was originally "Middlesex County Sewerage Authority," acquiring its current name, and the acronym "MCUA," just a few years ago. To simplify the terminology, all further references in this opinion will be to "MCUA," notwithstanding that some of the underlying events took place under the banner of the Sewerage Authority.

2. 33 U.S.C. § 1284(b)(1).
   In 1977, Section 204(b)(1) was amended to provide that

such dedicated ad valorem tax system shall be deemed to be the use charge system meeting the requirements ... of this paragraph....

A companion amendment provided:

A system of charges which meets the requirement ... of paragraph (1) of this subsection may be based on something other than metering the sewage or water supply flow of residential recipients of waste treatment services, including ad valorem taxes. If the system of charges is based on something other than metering the Administrator shall require (A) the applicant to establish a system by which the necessary funds will be available for the proper operation and maintenance of the treatment works; and (B) the applicant to establish a procedure under which the residential user will be notified as to that portion of his total payment which will be allocated to the cost of the waste treatment services.

The principal implementing regulations are the following provisions of 40 C.F.R. § 35.929–1:

§ 35.929–1 Approval of the user charge system.

The Regional Administrator may approve a user charge system based on either actual use under paragraph (a) of this section or ad valorem taxes under paragraph (b) of this section. The general requirements in §§ 35.929–2 and 35.929–3 must also be satisfied.

(a) *User charge system based on actual use.* A grantee's user charge system based on actual use (or estimated use) of waste water treatment services may be approved if each user (or user class) pays its proportionate share of operation and maintenance (including replacement) costs of treatment works within the grantee's service area, based on the user's proportionate contribution to the total waste water loading from all users (or user classes). To insure a propor*tional distribution of operation and mainte*nance costs to each user (or user class), the user's contribution shall be based on factors such as strength, volume, and delivery flow rate characteristics.

(b) *User charges based on ad valorem tax*es. A grantee's user charge system (or the user charge system of a subscriber, i.e., a constituent community receiving waste treatment services from the grantee) which is based on ad valorem taxes may be approved if it meets the requirements of paragraphs (b)(1) through (b)(7) of this section. If the Regional Administrator determines that the grantee did not have a dedicated ad valorem tax system on December 27, 1977, meeting the requirements of paragraphs (b)(1) through (b)(3) of this section, the grantee shall develop a user charge system based on actual use under § 35.929–1(a).

(1) The grantee (or subscriber) had in existence on December 27, 1977, a system of ad valorem taxes which collected revenues to pay the cost of operation and maintenance of waste-water treatment works within the grantee's service area and has continued to use that system.

(2) The grantee (or subscriber) has not previously obtained approval of a user charge system on actual use.

(3) The system of ad valorem taxes in existence on December 27, 1977, was dedicated ad valorem tax system.

(i) A grantee's system will be considered to be dedicated if the Regional Administrator determines that the system meets all of the following criteria:

(A) The ad valorem tax system provided for a separate tax rate or for the allocation of a portion of the taxes collected for payment of the grantee's costs of waste water treatment services;

(B) The grantee's budgeting and accounting procedures assured that a specified portion of the tax funds would be used for the payment of the costs of operation and maintenance;

(C) The ad valorem tax system collected tax funds for the costs of waste water treatment services which could not be or historically were not used for other purposes; and

(D) The authority responsible for the operation and maintenance of the treatment works established the budget for the costs of operation and maintenance and used those specified amounts solely to pay the costs of operation and maintenance.

(ii) A subscriber's system based on ad valorem taxes will be considered to be dedicated if a contractual agreement or a charter established under State law existed on December 27, 1977, which required the subscriber to pay its share of the cost of waste water treatment services.

(4) A user charge system funded by dedicated ad valorem taxes shall establish, as a minimum, the classes of users listed below:

(i) Residential users, including single-family and multifamily dwellings, and small nonresidential users, including nonresidential commercial and industrial users which introduce no more than the equivalent of 25,000 gallons per day of domestic sanitary wastes to the treatment works....

The 1977 Amendment permitting "a system of dedicated ad valorem taxes" to be accepted by the Administrator in lieu of a user charge system has, up to the late stages of this litigation, been of no avail to Sayreville, because all parties have proceeded on the assumption that Sayreville had no such system in force on December 27, 1977, a statutory requirement which fuels Sayreville's "equal protection" claim considered in Part II of this opinion, *infra.* With respect to Sayreville's alternative contention, advanced very tentatively before Judge Debevoise and enlarged upon in its brief

In 1976, the Administrator approved MCUA's grant application, thereby committing EPA to pay 75% of the multi-million dollar sewage treatment improvement project. But four years later, after having advanced 80% of the promised federal funds, EPA suspended further payments. The reason for the suspension was that Milltown and Sayreville had not adopted ordinances providing for user charges. The suspension triggered two law suits, of which this is the second.

The *first* law suit involved Milltown. Milltown is a municipality whose sewage is handled by MCUA but which is not a signatory to the 1954 Agreement or the 1975 Supplemental Agreement. The explanation for this apparent paradox traces to the fact that Milltown has, since 1914, had a contract with its larger neighbor, New Brunswick, under which the latter has seen to the collection and disposal of Milltown's sewage. Since the 'fifties, New Brunswick, a signatory of both MCUA agreements, has paid for MCUA's treatment and disposal of both New Brunswick's and Milltown's sewage. Because Milltown is not a signatory of the MCUA Agreements, it did not regard itself as bound by the provisions of the Supplemental Agreement calling for adoption and implementation of a user charge ordinance. But EPA took the position that Milltown is a "recipient of waste treatment services" within the meaning of Section 204(b)(1) of the Clean Water Act and hence obliged to put a user charge system into effect. MCUA and Milltown not only challenged EPA's reading of the statute but argued that the statute so read would work an unconstitutional impairment of Milltown's 1914 contract with New Brunswick. Judge Debevoise rejected these contentions. *City of New Brunswick v. Borough of Milltown,* 519 F.Supp. 878 (D.N.J.1981). And this court, speaking through Judge Garth, affirmed. *City of New*

*Brunswick v. Borough of Milltown,* 686 F.2d 120 (3 Cir. 1982).

The *second* law suit—this one—involves Sayreville. Sayreville is a signatory to the 1954 and 1975 Agreements. In February of 1981, MCUA brought an action against Sayreville and the members of the Sayreville Borough Council in the New Jersey Superior Court, seeking to mandamus the defendants to adopt a sewer use ordinance in fulfillment of Sayreville's 1975 commitment to do so. Sayreville impleaded Attorney General Smith, EPA Administrator Douglas M. Costle, and various subordinate officers of EPA and the Department of Justice, alleging, evidently in reliance on the Tenth Amendment, that EPA in promulgating rules enforcing the user charge system requirement "usurped the powers and perogatives [*sic*] not only of the United States Congress but also of the individual sovereign states and the political subdivisions thereof . . . ," and seeking damages or, in the alternative, "a declaration of the invalidity of the [EPA] rules. . . ." The federal defendants thereupon removed the litigation to the district court and moved for summary judgment dismissing the third-party complaint and declaring the validity of Section 204(b)(1) and its attendant regulations. MCUA moved for summary judgment against Sayreville. On December 1, 1981, Judge Debevoise entered an order which gave effect to a bench opinion delivered on November 16, 1981.[3] The order dismissed Sayreville's third-party complaint; declared that Section 204(b)(1) and the challenged regulations "are lawful and valid and authorize EPA to condition its award to MCUA of grant funds under Title II of the Clean Water Act . . . upon the requirement that MCUA assure that Sayreville adopt a system of sewer user charges . . . ;" and, without ruling on MCUA's motion for summary judgment, remanded the balance of the case to the Superior Court.

here (pp. 38–40), that it had a dedicated ad valorem tax in effect as of December 27, 1977, see Part III of this opinion, *infra.*

**3.** Judge Debevoise's bench opinion rested largely on his decision of a month before in *City of New Brunswick v. Borough of Milltown, supra,* which was subsequently affirmed by this court on June 24, 1982.

## I.

On this appeal, Sayreville continues to press its claim that Congress by statute[4] and EPA by regulation[5] have breached the Tenth Amendment by conditioning the MCUA construction grant on MCUA's implementation of an undertaking to put into force a user charge system—i.e., a system of charges which, in the words of Section 204(b)(1), is designed "to assure that each recipient of waste treatment services within the applicant's jurisdiction . . . will pay its proportionate share . . . of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant. . . ." In Sayreville's view, a grant so conditioned is calculated to coerce Sayreville to introduce a superfluous tax rather than pay its share of MCUA's services out of its happily sufficient general revenues. To force Sayreville to adopt an uncongenial tax is, Sayreville submits, in contravention of Sayreville's slice of New Jersey's sovereignty.

We note in passing that MCUA—the public body to whom the federal grant was made, on whom the condition was imposed, and from whom federal funds are now being withheld—has not raised a Tenth Amendment claim on its own or even acquiesced in the claim advanced by Sayreville.[6] Whether or not MCUA would have had standing to raise this Tenth Amendment claim, we are satisfied that Sayreville—the municipality whose revenue system EPA seeks to modify through enforcement of the condition—does have the requisite standing. Accordingly, we turn to the merits of the claim. This necessitates a consideration of what Congress intended the challenged condition to accomplish, and—in the light of Congress' purposes—

the degree to which the congressional constraint would curtail fulfillment of those central values of statehood vindicated in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The purposes subserved by the challenged condition are not obscure. Judge Debevoise in *City of New Brunswick v. Borough of Milltown, supra,* 519 F.Supp. at 883, found that his "interpretation of the [Clean Water] Act's user charge requirements and its implementing regulations [was] consistent with the underlying purposes and policies of the Act" for the following reasons:

> Legislative history reveals that Congress' purpose in providing for a user charge system was twofold: first, it was enacted "as a means of assuring that each federally assisted facility would have adequate operation and maintenance funds", and, second, the system was intended to be "a positive force in encouraging more efficient management of wastes discharged through a municipal system as well as an economic inducement to reduce excessive use". S.Rep.No. 95–370, 95th Cong., 1st Sess. (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 4326, 4352.

This court concurred in Judge Debevoise's analysis. *City of New Brunswick v. Borough of Milltown supra,* 686 F.2d 120 at pp. 132–133. And this court went on, *id.,* at p. 133, to observe that Congress' action in 1977, amending section 204(b)(1) to authorize EPA to accept an ad valorem tax, if in place on December 27, 1977, as an alternative to a user charge, had not " 'eviscerated' any conservation purpose to the user charge requirement" but was "intended simply to provide 'greater flexibility . . . for the assessment of user charges' [*U.S.Code Cong. & Ad.News* at 4352], and not to undermine

---

**4.** See text, *supra,* at n.2 for the pertinent language of Section 204(b)(1) as adopted in 1972; for the 1977 amendments, see n.2.

**5.** For the principal implementing regulation, see n.2, *supra.*

**6.** By contrast, in *City of New Brunswick v. Borough of Milltown, supra,* MCUA joined Milltown in challenging EPA's position. (EPA had determined that Milltown was, within the

meaning of Section 204(b)(1) a "recipient of waste treatment services," notwithstanding that Milltown was not a signatory of either the 1954 or the 1975 Agreements and that New Brunswick, a signatory of both Agreements, was obliged by contract to take care of Milltown's sewage disposal requirements and did in fact pay MCUA to handle Milltown's sewage as well as its own.)

the user charge concept itself of its underlying purposes." [7]

The question is whether the challenged condition, which reasonably implements Congress' incontestably valid purposes, infringes upon the sovereignty of New Jersey in the persona of the Borough of Sayreville. In *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264, 287–88, 101 S.Ct. 2389, 2365–2366, 69 L.Ed.2d 1 (1981), the Court stated that:

[I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the "States as States." [426

[7]. See also p. 132 n.19 in *City of New Brunswick v. Borough of Milltown*. For pertinent excerpts from the text of the 1977 amendments, see n.2 of this opinion, *supra*. The independent importance of the "conversation purpose" is underscored by the following colloquy in the court below between Judge Debevoise and counsel for Sayreville, just before Judge Debevoise delivered his bench opinion (App. pp. 45a–48a):

> THE COURT: Why are all the other 24 municipalities able to to this and Sayreville can't?
> MR. KARCHER: It benefits them to do it, but the Borough of Sayreville, it hurts us.
> THE COURT: That's life. Some things hurt more or less as you go along, and you have a sewer system.
> MR. KARCHER: We don't want the sewer system. We are host community to the largest cesspool-septic tank in the State of New Jersey. We really don't care, your Honor, if they would like to move it.
> THE COURT: You signed the agreement.
> MR. KARCHER: We signed the agreement, your Honor, saying that we would pay our bill, and we always have paid our bill. I have been in many courts where the issue was nobody did pay. Here we paid the bill, and they say not in the right fashion.
> What we are talking about here, the one guiding light here is whether or not the federal statute set up one standard with one idea, and that was to make sure that the systems protect the fiscal integrity of the system. Sayreville is doing nothing to undermine the fiscal integrity of the system, willing to pay our fair share. Always have been.
> THE COURT: That is not the issue in the case.
> The issue, the Federal Government added something more, either user charge or dedicated *ad valorem* tax.
> MR. KARCHER: We have had *ad valorem* tax.
> THE COURT: Not dedicated.
> MR. KARCHER: The State of New Jersey doesn't—that shows the insensitivity of the federal Government.
> THE COURT: Or lack of flexibility of the State of New Jersey.
> MR. KARCHER: That may well be, your Honor, but furthermore, even if we were to

> do it now, going to pay, presuming the State of New Jersey would let us do it, if we passed *ad valorem* tax as Mr. Journick was saying, we don't have any municipal tax rate. In the Borough of Sayreville we don't tax on *ad valorem* to run the city. Don't have to.
> THE COURT: All the more reason to have user tax.
> MR. KARCHER: That is the reason we should not. Why impose on the widow who is living in her house a fee upon her which she doesn't have to pay? We can pay it out of general revenue. We do not have to impose that....

> \*　　\*　　\*　　\*　　\*　　\*

> The person I am here to protect is the homeowner who doesn't have to have this imposed on them. It is senseless; it is redundant, duplicative, and it is an expense, a tax that the taxpayer in Sayreville doesn't have to pay. It is, really the only issue is common-sensical. Why are they forcing us to tax people that we don't have to tax? In this day and age of all issues, I don't think anything could be more important, and it would perhaps—no case could be more graphic in demonstrating this insensitivity of bureaucracies where they are telling us we have to charge people for something, even though we have the money to pay it already and do pay it already.
> THE COURT: That really is an option the Federal Government has, I would think, and they have given reasons for doing it, and it may work better or worse in different communities.
> MR. KARCHER: We wouldn't be here and wouldn't be contending if they gave a reason.
> THE COURT: They did give a reason, a user charge is useful in impressing upon people from the large utilities to the widow in her home the desirability of not using the sewage facilities so extravagantly. Keep the water flow down. Keep budgeting your dishwashing all the rest. That is the theory behind it, as I understand it.
> MR. KARCHER: I don't see that, your Honor. What I see is the purpose to provide that it be a pay-as-you-go fiscal integrity of the system be guaranteed.
> THE COURT: That is another reason.

U.S.] at 854 [96 S.Ct. at 2475]. Second, the federal regulation must address matters that are indisputably "attribute[s] of state sovereignty." *Id.,* at 845 [96 S.Ct. at 2471]. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional governmental functions." *Id.,* at 852 [96 S.Ct. at 2474].

■ Because the challenged condition relates to the ways in which Sayreville and other affected state sub-entities are to raise and allocate revenues, it arguably addresses "States as States" and in relation to "attributes of state sovereignty." But what the condition does not do is "directly impair" the freedom of states " 'to structure integral operations in areas of traditional governmental functions.' " It does not "directly impair" Sayreville's—let alone New Jersey's—freedom at all. What the condition does is to state a limitation on the expenditure of federal funds—funds which, as MCUA notes in its brief, "MCUA and its constituent municipalities were free not to apply for." [8]

In *City of New Brunswick v. Borough of Milltown, supra,* this court observed: "As a general rule, it is clear that 'Congress may fix the terms on which it shall disburse federal money to the States.' *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981); *see King v. Smith,* 392 U.S. 309, 333 n.34, 88 S.Ct. 2128, 2141 n. 34, 20 L.Ed.2d 1118 (1968). Moreover, while that power is not without limits, *see* 451 U.S. at 17 n.13, 101 S.Ct. at 1540 n.13, it is indisputable that the power to fix terms lies essentially with the Congress, and not with the federal courts." PP. 134–135. In *FERC v. Mississippi,* —— U.S. ——, ——, 102 S.Ct. 2126, 2141, 72 L.Ed.2d 532 (1982), the Supreme Court had recent occasion to develop the same theme, in terms which are dispositive of Sayreville's Tenth Amendment claim:

> [T]he Court has recognized that valid federal enactments may have an effect on state policy—and may, indeed, be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority. Thus in *Oklahoma v. Civil Service Comm'n,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), the Court upheld Congress' power to attach conditions to grants-in-aid received by the States, although the condition under attack involved an activity that "the United States is not concerned with, and has no power to regulate." *Id.,* at 143, 67 S.Ct., at 553. The Tenth Amendment, the Court declared, "has been consistently construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end,' " *ibid,* quoting *United States v. Darby,* 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941)—the end there being the disbursement of federal funds.

---

8. P. 10. Both MCUA (Brief pp. 10–11) and Sayreville (brief p. 15) recognize that, as the Fourth Circuit held in *State Water Control Board v. Train,* 559 F.2d 921, 924 (1977), the obligation of sewage authorities to comply with federal effluent standards is independent of the entitlement of such authorities to seek federal funding to facilitate compliance. Both MCUA and Sayreville assert in their briefs that in practice compliance cannot be achieved without federal funds. (MCUA brief pp. 10–11) (Sayreville brief, pp. 15–17). Since the parties did not undertake to make a record on this issue below, we have no basis for determining whether the MCUA-Sayreville assertions are well founded. If, in another case, that issue were tendered, the question might arise wheth-er the Tenth Amendment challenge was properly directed not at the user charge/ad valorem tax requirement but at the obligatory effluent standards themselves. In such a context, even if all three of the *Hodel* criteria were met, the gravity of the federal interest would have to be factored in. 452 U.S. at 288 n. 29 [101 S.Ct. at 2366 n. 29]. And compare Justice Blackmun's emphasis, in his concurrence in *National League of Cities v. Usery,* on the non-applicability of that ruling "in areas such as environmental protection, where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential." 426 U.S. at 856, 96 S.Ct. at 2476.

As the Chief Justice made plain, speaking for the unanimous Court in *United Transportation Union v. Long Island Railroad Company,* 455 U.S. 678, 686–87, 102 S.Ct. 1349, 1354–55, 71 L.Ed.2d 547 (1982), what *National League of Cities v. Usery* requires of a court seized of a Tenth Amendment claim is to conduct "an inquiry into whether the federal regulation affects basic State prerogatives in such a way as would be likely to hamper the state government's ability to fulfill its role in the Union and endanger its 'separate and independent existence.'" We hold that the federal regulation challenged here does not impinge on New Jersey's sovereignty.

## II.

As an alternative to its Tenth Amendment claim, Sayreville argues that in lieu of adopting a user tax, as Sayreville promised to do in the 1975 Supplemental Agreement, it should be permitted to satisfy EPA's requirements through an ad valorem tax dedicated to sewage costs. That option would have been open to Sayreville under the 1977 amendments to Section 204(b)(1), provided Sayreville had had a dedicated ad valorem tax in force as of December 27, 1977. Sayreville argues that distinguishing between communities which had a dedicated ad valorem tax in force in 1977 and those communities which, like Sayreville, were thereafter prepared to adopt such a tax, deprives the latter group of "the equal protection of the laws."[9]

The federal defendants argue that Sayreville should not be heard to raise an equal protection claim here, because it made no such claim in the district court. As a general matter, this court will not entertain claims not made below. However, while not condoning Sayreville's failure to bring all its federal claims to Judge Debevoise's attention, we are reluctant to conclude that this municipality, representing the aggregate interests of its inhabit-

ants, is thereby foreclosed from presenting to this court what it perceives as a serious constitutional claim. Therefore, we turn to an examination of the genesis of the 1977 amendments in order to determine whether Congress' limitation of ad valorem taxes to those in force in 1977 had some rational foundation.

As this court pointed out in *City of New Brunswick v. Borough of Milltown, supra,* at p. 133 n.19, EPA regarded dedicated ad valorem taxes as satisfying Section 204(b)(1) as originally written, but the Comptroller General in a 1974 ruling disagreed, concluding that a typical ad valorem tax would not adequately advance the statute's "conservation purpose." 54 Comp. Gen. 1. Accordingly, when Congress, in 1976, took up proposals to amend the Clean Water Act, one of the items pressed by EPA Administrator Russell E. Train was liberalization of Section 204(b)(1). By letter of April 17, 1976 to Chairman Robert E. Jones of the House Committee on Public Works and Transportation, Mr. Train made the following recommendations under the heading "User Charges" (Brief for Federal Defendants, appendix C):

*User Charges*

H.R. 9560 would amend section 204(b) of the Federal Water Pollution Control Act to allow municipalities to use an ad valorem tax for funding operation and maintenance costs.

Unless an amendment to section 204 is enacted, the decision by the Comptroller General that ad valorem taxes are not a proper basis for levying user charges will have a severe impact on the implementation of the construction grant program as well as upon municipal compliance with the requirements of the Act.

Numerous cities and districts, including many large metropolitan areas, presently finance operation and maintenance costs through ad valorem taxes. Considering

---

9. Sayreville characterizes this claim as one arising under the Fourteenth Amendment. But since the constitutional challenge is directed not at a state but at the United States, the Fifth Amendment, which does not speak *in haec verba* of equal protection but which incorporates equal protection principles in due process of law, *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), would appear to be the relevant source of Sayreville's claim.

the substantial costs involved, many of these cities are understandably unwilling to revise their systems. Moreover, in those cases where there is willingness to comply with the requirements of section 204(b)(1), the compliance will cause considerable delays before we accomplish any measure of progress in waste treatment plant construction.

As you know, the Environmental Protection Agency has also made a proposal to amend this section. The principal difference between the two amendments lies in the eligibility of municipalities to apply this tax. Our proposal would limit the use of the ad valorem tax to those municipalities where sewage treatment costs have traditionally been paid through such a user charge system and where a change to a direct charge would be inordinately disruptive. H.R. 9560, on the other hand, does not apply such limitations.

We believe that federally assisted sewer systems involving new collections systems should not use ad valorem tax as a matter of course to serve as a basis for assessing user charges. We, therefore, support the ad valorem user charge, but believe its application should be limited to historical use of this tax by municipalities or to instances where direct user charges would be inordinately disruptive.

■ As the legislative process went forward, EPA continued to support enlargement of Section 204(B)(1) to encompass ad valorem taxes, but also continued to couple this with insistence that the ad valorem tax—a tax less well attuned to the "conservation purpose" than a user charge geared precisely to the amount of sewage generated—be one which was in "previous use . . . and that we do not in any way indicate to any community that ad valorem system can now be implemented as a substitute for user charges. It must be one that is presently supporting the O. & M. [operation and maintenance] expense." Testimony of Assistant Administrator Thomas J. Jorling, *Legislative History of the Clean Water Act of 1977,* 95th Cong., 2d Sess., p. 1126. See generally *id.* at 439, 549, 1284, 1288, 1296, 1297, 1307–09, 1358–60.

As adopted, the 1977 amendment to Section 204(b)(1) followed EPA's strong submission that ad valorem taxes should be sanctioned only where they were already in place and utilized for, *inter alia,* sewage charges. That this was a rational limitation seems hardly open to debate. Accordingly, it is a limitation which is proof against Sayreville's "equal protection" challenge.

### III.

Finally, Sayreville argues here (brief, pp. 38–40) a position very tentatively urged before Judge Debevoise on November 16, 1981 (App. 48a–49a)—namely, that Sayreville in 1977 did have in force what EPA, under the 1977 amendments and the implementing regulations, could regard as a dedicated ad valorem tax. Judge Debevoise did not deal with this quasi-contention—presumably for the very good reason that it had never been communicated to EPA so there was no administrative determination to review. See App. 36a–37a, 49a. On April 22, 1982—a week after filing its brief here—counsel for Sayreville wrote to the Regional Administrator of EPA and the Raritan Basin Manager of the New Jersey Department of Environmental Protection. The burden of the letter was to argue that, in light of Sayreville's contractual commitment to pay MCUA for sewage services pursuant to the 1954 and 1975 Agreements, Sayreville's existing taxes constitute dedicated ad valorem taxes, in force as of December 27, 1977, within the meaning of Section 204(b)(1) as amended and the implementing regulations. Whether that submission has merit is a matter which should be considered in the first instance by EPA, not by a court of appeals.

### CONCLUSION

For the foregoing reasons, the judgment of the district court will be affirmed.